**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ETAGEGN HAILE TEKLE,
                                        *Petitioner,*

v.

MICHAEL B. MUKASEY,* Attorney
General,

                                        *Respondent.*

No. 05-76841

Agency No.
A97-369-313

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
January 18, 2008—San Francisco, California

Filed July 18, 2008

Before: John T. Noonan, William A. Fletcher, and
Carlos T. Bea, Circuit Judges.

Opinion by Judge William A. Fletcher

---

*Michael B. Mukasey is substituted for his predecessor, Alberto R. Gonzales, as Attorney General of the United States, pursuant to Federal Rule of Appellate Procedure 43(c)(2).

**COUNSEL**

Kate Bushman, Jones Day, New York, New York, Etagegn
Haile Tekle, pro se, Las Vegas, Nevada, for the petitioner.

Andrew B. Insenga, US Department of Justice, OIL, Wash-
ington, D.C., for the respondent.

**OPINION**

W. FLETCHER, Circuit Judge:

Etagegn Haile Tekle petitions for review of a decision of
the Board of Immigration Appeals ("BIA") affirming the
Immigration Judge's ("IJ") denial of her application for asy-
lum, withholding of removal, and relief under the Convention
Against Torture. Because we find that the BIA's adverse cred-
ibility determination was not based on substantial evidence,
we grant the petition and remand to the BIA for further pro-
ceedings.

## I. Background

Tekle is a citizen of Ethiopia and a member of the Oromo racial group. Her husband is also a citizen of Ethiopia and an Oromo. Tekle entered the United States on February 23, 2003 with a valid B-2 visitor's visa. She applied for asylum on February 12, 2004.[1] Her application was referred to an IJ, who conducted a merits hearing on July 22, 2004. At that hearing, Tekle testified that security agents of the Ethiopian government had arrested and tortured her on account of her active membership in the Oromo Liberation Front ("OLF"), a political organization that supports independence for the Oromo people. Her brother, a lawful permanent resident of the United States, testified on her behalf.

We observe that immediately prior to Tekle's testimony, the IJ offered the following comment for the record:

> I have one other comment, and again, I don't care if the 9th Circuit wants to report this to my supervisor. The 9th Circuit does not comply with Supreme Court law with regard to asylum. While I am in the 9th Circuit and have to comply, I do note that they don't really care what Immigration [J]udges do. If an Immigration [J]udge makes an adverse credibility determination, they will, in only one case out of every 250 to 300, affirm it. So I don't play their game with regard to credibility determinations. In my view, an asylum merits hearing is analyzed on the basis of whether the claim itself is credible as opposed to testimony because that's really the, the strength of it, because it's very rare that an Immigration [J]udge can make and have withstand either with the Board or with the 9th Circuit, under applica-

---

[1] The potentially relevant provisions of the REAL ID Act are not retroactive and therefore do not apply to Tekle's claim. *See Kaur v. Gonzales*, 418 F.3d 1061, 1064 n.1 (9th Cir. 2005).

ble 9th Circuit case law, an adverse credibility deter-
mination.

To clarify the record, we note that the IJ's assertions about
this court's review of adverse credibility findings, even under-
stood as hyperbole, are incorrect. According to statistics pro-
vided by the Ninth Circuit Staff Attorneys' Office, in asylum
cases decided between January 2005 and March 2008 the
Ninth Circuit affirmed approximately 80% of all adverse
credibility findings.[2] Cases such as this one, in which the
Ninth Circuit reverses an IJ's adverse credibility finding, are
the exception, rather than the rule.

On direct examination, Tekle testified that on October 12,
2002, security agents of the Ethiopian government arrested
her and took her to the central jail in Addis Ababa. She testi-
fied that when she first arrived at the jail, an officer interro-
gated her and then took her to a small cell with approximately
twenty other women, several of whom were also OLF mem-
bers. Early in the hearing, Tekle's attorney focused on the
subsequent interrogations:

> Q:  What happened to you? Were you interrogated
>     again?
>
> A:  I was, I was told that I was needed for investi-
>     gation and I was tortured. They beat me in my
>     feet.
>
> Q:  What do you mean, they beat on your feet?
>
> A:  They—I was put in this position where they
>     would put a rod between my two legs behind
>     my knees and they flipped my, the inside of my
>     —the bottom of my feet, they flipped it, so it
>     would be exposed and they beat me there.

---

[2]This figure includes cases not selected for oral argument.

Q:   What did they beat you with?

A:   Electric wires.

Q:   How long was the beatings [sic]?

A:   I don't recall for how long, but I remember I
     was yelling and screaming and the guy was say-
     ing, why don't you die.

Q:   Did they tell you why they were beating you?

A:   They asked me about my husband's where-
     abouts and if we had weapons.

Tekle's attorney then briefly digressed to allow Tekle to
explain that her husband was also an active OLF member. He
then resumed his questions about the interrogation:

Q:   How many times did they beat you?

A:   I cannot quantify it in hours, but they were just
     continuously beating me.

Q:   Okay. Did you tell them what they wanted?

A:   No, I did not. I told them I did [not] know any-
     thing. I, I feared that if I g[a]ve them any infor-
     mation, it would exacerbate my situation.

   Tekle then testified that her father posted bail and paid
bribes for her release, and that when she was discharged on
October 26, 2002, she was told that if she were "ever caught
participating in [Oromo] activities," they would "put [her] in
jail forever." She testified that since her arrival in the United
States, she learned from her mother that her father "had to
bear a lot of suffering" because "he was accused of letting his

daughter . . . flee the country after posting bail and he was interrogated regarding [Tekle's] husband's whereabouts."

On cross examination, the government's attorney asked Tekle how many times she had been questioned during her fourteen days of detention, and she replied that she had been interrogated three times. The attorney then asked about the nature of those interrogations:

Q:   And all three times they questioned you, did they physically touch you?

A:   No, only one occasion.

Q:   Okay. So, on one occasion they physically touched you?

A:   Yes. They beat the sole of my feet until it's swollen.

Q:   Okay. And how long did they beat the soles of your feet?

A:   For a long period of time.

Q:   Okay. What does that mean? I'm not sure what a long period means.

A:   I'm not sure for how long or for how many hours, but the whole thing, I know, took hours and I was screaming and I was in a lot of stress.

Q:   They questioned you for hours?

A:   They would question me, stop and then question me and that took some time. And they asked me to identify our leader.

Q: Okay. So besides the question of identify your leader, what other question would they ask you?

A: The other questions were—mostly they would be . . . questions like, what did your husband do, what was his activity, did you guys have weapons, where are you hiding them. Stuff like that.

Next, the IJ questioned Tekle. In response to one of the IJ's questions, Tekle stated that officials "put [her] father in custody" because she had fled the country. She also testified that the government initiated its current campaign against the OLF in the fall of 2001. The IJ then returned to the topic of Tekle's interrogations, asserting that she had testified on direct examination that her torture had "occurred continuously during the time that [she was] detained for two weeks," while

Q: [W]hen the[y] asked you this morning, how many times it occurred, you said that they only tortured you once for several hours. So, what's correct? You were tortured by the electric wires under the feet—underneath the soles of your feet on a continuous regular basis, one time, many times. What, what's, what is an accurate answer?

A: I said on one occasion and it happened for several hours.

Q: All right. So then, why did you say to your attorney it was continuous during the time that you were detained. They're not consistent. Can you explain that to me?

A: If I said continuous, I'm relating to the one occasion. The beating was continuous at the specific time, but I did not say at different days.

Tekle also testified on direct examination that her husband had disappeared and that she "still d[id] not know his current whereabouts." She added on cross examination that he had been involved in OLF activities for a long time. She testified that he went into hiding after learning of her arrest. She stated that after she fled the country, he came out of hiding to visit their children, and was subsequently arrested and detained.

On re-cross examination, the government's attorney asked Tekle about her birth certificate, which she had obtained in July 2002, prior to her arrest. Tekle stated that she obtained the document because she "was coming [to the United States] and [she] thought that [she] needed the document here for identity purposes." The attorney pressed her on the timing of events:

> Q: Why would you be coming to the United States before you were arrested?
>
> A: Because the conditions in the country had deteriorated. There were rampart [sic] arrests that are occurring to others like me and I d[id]n't want to face the same fate as the others.
>
> Q: So now you're saying that you'[d] already decided to come to the United States before you were arrested.
>
> A: Yes, I ha[d] plans to escape the country before my arrest.
>
> Q: When is [it] that you formed these plans?
>
> A: When there were rampart [sic] arrests. There were arrests of others within our organization, those who were leaders of the meetings.

Tekle's brother, who had been excluded from the hearing room during Tekle's testimony, then testified. On cross exam-

ination, he testified that Tekle had spoken with him about leaving Ethiopia and coming to the United States prior to her arrest. He testified that she did so "[b]ecause she was involved and her husband was active and the situation there was very dangerous." He testified that after Tekle's release from jail, they had "to accelerate the process" of Tekle leaving the country "because at that time, I, myself, felt that she was facing death." The IJ then asked him what he knew of the treatment of his family members since Tekle had left Ethiopia. The brother stated that the government had "threatened my father, they told him, that they assisted her to leave the country even though she was under government . . . detention." The IJ then asked whether "your father, your mother, or any of your brothers ever [was] arrested and detained after she came here to the United States?" He replied, "As far as I know, no one was arrested, but I know my father was questioned."

The IJ stated that he denied Tekle's application for relief because he found that her testimony was not credible. In making this adverse credibility finding, the IJ explicitly "acknowledge[d] and, indeed, . . . embrace[d], numerous discussions in [two country reports in the record] about the anti-Oromo attitude of the government, the fact of arrests and detention without warrant, and very bad human rights abuses in prisons in Ethiopia by the present government of Ethiopia." The IJ referred to specific pages in those country reports. Those pages contain the following information of particular relevance to Tekle's claim: "The [Ethiopian] Government continued to arrest and detain persons arbitrarily, particularly those suspected of sympathizing with or being members of the OLF." U.S. Department of State, Ethiopia: Country Reports on Human Rights Practices 2003 (Feb. 25, 2004). "Security forces committed a number of unlawful killings and at times beat, tortured, and mistreated detainees." *Id.* "Thousands of criminal suspects remained in detention without charge; many of the detainees were accused of involvement in OLF activities[.]" *Id.* After violent altercations with stu-

dents in March and April 2002, "[p]olice subsequently arrested several hundred students, teachers, and others whom it accused of being members or sympathisers of the [OLF], an armed movement that the government claimed had instigated the student protests." Country Information & Policy Unit of the Home Office (U.K.), Ethiopia Country Report (Oct. 2003).

> Since the Government banned the OLF a decade before, thousands of alleged OLF members or sympathisers have been arrested, and this trend continued in 2002. As of March 2002, more than 1,700 such prisoners were reportedly held at the Ghimbi central prison, half of them arrested recently and the rest having been there for five to ten years, some without charge . . . . Prisoners who were released or escaped from incarceration reported being severely tortured whilst imprisoned.

*Id.*

The IJ offered eight reasons in support of his adverse credibility finding. In the alternative, the IJ also determined, "[a]ssuming that the Court would find credible and truthful the testimony of the respondent," that Tekle had "not demonstrated severe past persecution." The IJ further found that Tekle had satisfied the subjective standard for future persecution, but that her fear of harm was the result of "general conditions of violence and civil unrest in" Ethiopia, and did not constitute a well-founded fear of persecution. Consequently, the IJ found that Tekle was ineligible for asylum and withholding of removal. The IJ found that Tekle had failed to demonstrate that it was more likely than not that she would be tortured by the government if she were to return to Ethiopia, and that therefore she was not entitled to relief under the Convention Against Torture. The IJ granted Tekle voluntary departure.

The BIA held that the IJ's "adverse credibility finding [wa]s not clearly erroneous." The BIA stated that the IJ "identified specific inconsistencies and discrepancies that are supported by the record, are central to [Tekle's] claim that she was persecuted on account of her activities with the Oromo Liberation Front, and were not adequately explained." The BIA, in so affirming, referred to only four of the IJ's eight articulated grounds for the adverse credibility finding. The BIA identified those four grounds as "[m]ost significant[,]" and provided citations to the record in support of those reasons. The BIA did not mention the other four grounds. The BIA then added that, "[i]n view of the decision regarding the respondent's credibility, we need not address [Tekle's] arguments pertaining to the [IJ's] alternate finding that the treatment she claimed to have endured did not rise to the level of persecution." The BIA also affirmed the IJ's grant of voluntary departure. Tekle timely appealed the final decision of the BIA.

## II.   Standard of Review

The BIA did not conduct a de novo review of the IJ's decision, *cf. Krotova v. Gonzales*, 416 F.3d 1080, 1084 (9th Cir. 2005), but instead reviewed the IJ's decision for clear error, *see Rivera v. Mukasey*, 508 F.3d 1271, 1274 (9th Cir. 2007). The BIA stated "with sufficient particularity and clarity the reasons for denial of asylum" and did not merely provide a "[b]oilerplate opinion[.]" *Castillo v. INS*, 951 F.2d 1117, 1121 (9th Cir. 1991). In conducting its clear error review, the BIA "relie[d] upon the IJ's opinion as a statement of reasons." *Kozulin v. INS*, 218 F.3d 1112, 1115 (9th Cir. 2000). We therefore "look to the IJ's oral decision as a guide to what lay behind the BIA's conclusion." *Id.* In so doing, we review here the reasons explicitly identified by the BIA, and then examine the reasoning articulated in the IJ's oral decision in support of those reasons. *Cf. Rivera*, 508 F.3d at 1275 ("When the BIA has reviewed the IJ's decision and incorporated parts of it as its own, we treat the incorporated parts of the IJ's decision as

the BIA's."). Stated differently, we do not review those parts of the IJ's adverse credibility finding that the BIA did not identify as "most significant" and did not otherwise mention.

"We review the BIA's findings of fact, including credibility findings, for substantial evidence and must uphold the BIA's finding unless the evidence compels a contrary result." *Almaghzar v. Gonzales*, 457 F.3d 915, 920 (9th Cir. 2007) (internal quotation marks omitted); *see* 8 U.S.C. § 1252(b)(4)(B). Under this deferential standard of review, "the IJ or BIA must identify specific, cogent reasons for an adverse credibility finding, and the reasons must . . . . strike at the heart of the claim for asylum." *Singh v. Gonzales*, 439 F.3d 1100, 1105 (9th Cir. 2006) (internal quotation marks and citations omitted). "Minor inconsistencies that reveal nothing about an asylum applicant's fear for her safety are not an adequate basis for an adverse credibility finding." *Kaur v. Ashcroft*, 379 F.3d 876, 884 (9th Cir. 2004) (internal quotation marks and brackets omitted). "An IJ must . . . afford petitioners a chance to explain inconsistencies, and must address these explanations." *Singh*, 439 F.3d at 1105.

## III.    Discussion

The BIA affirmed the IJ based on only four of the reasons the IJ provided in support of his adverse credibility finding.[3]

---

[3] The BIA had good reason to decline to rely on the IJ's other four grounds. Those grounds were as follows:

First, the IJ concluded that Tekle "deferred, delayed, or hesitated before responding to certain of questions." The IJ's demeanor finding is not supported by substantial evidence. The IJ did not "specifically and cogently refer to any aspect of [Tekle's] demeanor," *Arulampalam v. Ashcroft*, 353 F.3d 679, 686 (9th Cir. 2003), and did "not identify specific examples of evasiveness or contradiction in [Tekle's] testimony," *Garrovillas v. INS*, 156 F.3d 1010, 1013 (9th Cir. 1998). The IJ also failed to identify any specific examples of non-verbal behavior that might suggest that Tekle was not credible. *See Jibril v. Gonzales*, 423 F.3d 1129, 1137 (9th Cir. 2005); *cf. Singh-Kaur v. INS*, 183 F.3d 1147, 1151 (9th Cir. 1999).

"We independently evaluate each ground cited by the IJ for his adverse credibility findings." *Chen v. Ashcroft*, 362 F.3d 611, 617 (9th Cir. 2004). "So long as one of the identified grounds is supported by substantial evidence and goes to the heart of [the] claim of persecution, we are bound to accept the IJ's adverse credibility finding." *Wang v. INS*, 352 F.3d 1250, 1259 (9th Cir. 2003). We conclude that the BIA has failed to provide "specific, cogent reasons" in support of the adverse credibility finding. Therefore, the adverse credibility finding is not supported by substantial evidence.

The four grounds upon which the BIA relied were as follows:

## A.   Duration of Torture

[1] First, the IJ found that Tekle's testimony was internally inconsistent with respect to the duration of her torture. The IJ asserted that

---

Second, the IJ stated that Tekle's testimony was inconsistent with an OLF document indicating the year in which she joined the OLF. The IJ's finding is factually erroneous. The confusion stems from a translation that failed to translate a date appearing in the Ethiopian calendar into its corresponding date in the western calendar. *Wang v. INS*, 352 F.3d 1250, 1254 (9th Cir. 2003); *Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002); *He v. Ashcroft*, 328 F.3d 593, 598 (9th Cir. 2003).

Third, the IJ concluded that it was implausible that Tekle was not arrested again after her release from custody. This finding is based on impermissible speculation. *Singh v. Gonzales*, 439 F.3d 1100, 1105 (9th Cir. 2006); *Wang*, 352 F.3d at 1255. Tekle testified that she would face imprisonment only if she violated the terms of her release by participating in "Oromo activities." After she was released from prison, she went into hiding and did not participate in any such activities. Therefore, Tekle did nothing to prompt the government to re-arrest her.

Fourth, the IJ speculated that because Tekle applied prior to, but near, the one-year asylum filing deadline, her asylum claim was not credible. The IJ's finding is not supported by logic, much less substantial evidence in the record. Tekle and her brother also provided consistent and reasonable explanations for the time it took Tekle to prepare her application. The IJ failed to address those explanations. *Kaur v. Ashcroft*, 379 F.3d 876, 887 (9th Cir. 2004).

On direct examination today, the respondent stated that she was "continuously tortured during the two-week detention." During cross examination, the respondent stated that she was beaten on the soles of her feet on one occasion only for several hours. When the Court sought to give to the respondent the opportunity to clarify this inconsistency or discrepancy, she simply stated that she saw no inconsistency between . . . her testimony on direct or testimony on cross.

The IJ's conclusion is based on the IJ's and the government attorney's misrepresentation of Tekle's testimony.

**[2]** Tekle never testified or even suggested that she had been beaten throughout her two-week detention. Rather, when her attorney was questioning her about one particular interrogation during those two weeks, she responded that she could not "quantify it in hours, but they were just continuously beating me." The IJ subsequently represented to Tekle that she had "said that this [torture] occurred continuously during the time that you were detained for two weeks." Tekle responded, consistently with her earlier testimony, that she had "said on one occasion and it happened for several hours." When the IJ asked her to explain why she had said "it was continuous during the time that you were detained," Tekle replied, "If I said continuous, I'm relating to the one occasion. The beating was continuous at the specific time, but I did not say at different days." The IJ simply misunderstood, or misremembered, the context in which Tekle used the word "continuously."

### B.   Subject Matter of Interrogations

**[3]** Second, the IJ found that Tekle's testimony contradicted her asylum application. Her application stated that she and three other OLF detainees in her cell were "interrogated, tortured and beaten by the police about our knowledge and upper contacts with the OLF organization." The IJ concluded

that this statement in her application was inconsistent with her testimony:

> During questioning today, the respondent stated that the questioning of the respondent was focused on predominantly two considerations, involving the respondent and her husband in OLF activities and whether they had possession and control of weapons to use against the government.

> During questioning by Government counsel today, on cross-examination, the respondent reiterated that when she was detained, she was asked about her activities and those of her husband in the OLF. She was also asked whether any other issues were asked of her or any other information during her questioning, to which she replied in the negative. When the Court questioned the respondent on what was addressed during her questioning, she merely stated that she was asked about her activities and those of her husband in the OLF. Clearly, her testimony today is not consistent with the statement that was prepared in tandem with her asylum application, that the focus was on the OLF as an organization and her knowledge and that of other cell mates on the upper echelon of the OLF.

[4] The IJ mischaracterized Tekle's testimony as stating that her interrogators merely "asked about her activities and those of her husband in the OLF." Tekle stated that her interrogators asked her "to identify our leader," *and* "questions like, what did your husband do, what was his activity, did you guys have weapons, where are you hiding them. Stuff like that." Moreover, the IJ failed to afford Tekle a chance to explain this purported inconsistency. Had she been given such an opportunity, she might have reiterated that she had been asked to identify her OLF leader, or she might have provided information about the interrogations of her cell mates. She

also might have explained that her interrogators did not question her further about the "upper echelon of the OLF" because she "told them I did [not] know anything. I, I feared that if I give them any information, it would exacerbate my situation." The IJ's failure to provide Tekle with an opportunity to explain this perceived inconsistency is legal error. Therefore, this purported inconsistency cannot form the basis for an adverse credibility finding. *See Chen*, 362 F.3d at 618.

### C.　Father's Detention

Third, the IJ found that Tekle's testimony was not consistent with her brother's testimony with respect to whether their father had been arrested or detained. The IJ stated:

> [T]he respondent in her testimony today stated that after she left Ethiopia because her father had assisted her and allowed her to depart the country despite the purported outstanding warrant or order that she be available to come back for further questioning, by virtue of her father's acquiescence to her departing the country that he was threatened and he was, on at least one occasion, detained and interrogated by the government, versus the testimony of her brother, who stated that he also has remained in regular contact with his family and through which he stated, that through his knowledge, except for "harassment" that no member of the family had been arrested and detained since his sister came to the United States in February 2003.

**[5]** Contrary to the IJ's finding, Tekle's testimony was consistent with her brother's testimony. Tekle testified that she had learned that officials had "put my father in custody" and that they had "interrogated" him. Her brother testified that "[a]s far as I know, no one was arrested, but I know my father was questioned." Neither sibling claimed that the father had been arrested. Tekle's brother was never asked whether the

father had been detained or taken into custody. In the U.S. criminal justice system, Fourth Amendment jurisprudence tends to equate "custody" and "arrest," *see, e.g.*, *Stansbury v. California*, 511 U.S. 318, 322 (1994) (concluding that in determining whether a person is "in custody" for *Miranda* purposes, a court must determine whether there had been either a formal arrest or a "restraint on freedom of movement of the degree associated with a formal arrest" (internal quotation marks omitted)), but there is no inconsistency when lay witnesses speaking of police practices in another legal system state that a person was placed "in custody" and "interrogated" or "questioned," without being "arrested." Indeed, even our own legal system recognizes a linguistic distinction between a "formal arrest" and other restraints on freedom of movement of a degree that would be "associated with a formal arrest." *Id.*

**[6]** Even if we assume for the sake of argument that the distinctions between the two accounts would have carried some weight if both Tekle and her brother had purported to have first hand knowledge of their father's treatment, here the discrepancies between their reports fail to strike at the heart of Tekle's claim. The fact that one family member was told one set of facts, while another family member was told a slightly different set of facts, does not make either family member less credible. We also note that the IJ failed to provide Tekle with an opportunity to explain this purported inconsistency.

**[7]** Both Tekle and her brother qualified their testimony regarding their father as hearsay. If there is no reason to doubt that a third party told the witness particular things, and if there is no reason to doubt that the witness sincerely believed that third party, then the fact that the IJ later doubts the veracity of the third party's story should not, under ordinary circumstances, form the basis for an adverse credibility finding. Indeed, if the IJ challenges the third party's story as not credible, the witness may not have access to the facts necessary to provide an explanation.

### D.   Timing of Decision to Flee Ethiopia

Fourth, the IJ found that Tekle's testimony was internally inconsistent, as well as inconsistent with her asylum application, regarding the timing of her decision to flee Ethiopia. The IJ stated:

> [I]n her statement attached to her asylum application, . . . and on direct examination, the respondent was emphatic that after her detention and release in October 2002, she made the decision to leave Ethiopia for the United States. By contrast, during re-cross examination by counsel, it was disclosed for the first time and subsequently when her brother testified that, in fact, she had made the decision as early as the summer of 2002 to depart Ethiopia for the United States because of general conditions there, but not necessarily limited to the treatment of members of the Oromo group. The respondent has provided no explanation for this omission in her statement versus her testimony today.
>
>     . . . [T]he Court believes that it is relevant and pertinent to the inquiry that the respondent sought assistance from her brother to leave Ethiopia well before either she or her husband had any negative interaction with the government[.]

The IJ concluded that it was "significant and persuasive and not insignificant, that the determination of the respondent to depart a country in turmoil, militarily and economically, blossomed well before the reported arrest and detention of October 2002."

**[8]** Tekle consistently represented the timing of her decision to leave Ethiopia. She testified that the Ethiopian government had begun a crackdown on its opponents in 2001, and that many of the government's targets were Oromos. When

she was released from prison, the authorities told her that if she ever participated in Oromo activities again, she would be put in jail forever. Her asylum application stated that the conditions of her release placed her in a "fearful mind," and "[t]o regain peaceful mind and security I decided to leave the country *once for good*." (Emphasis added.) She never stated or even suggested that she had never considered leaving Ethiopia prior to her arrest.

When the government's attorney confronted her about the fact that she had obtained her birth certificate in July 2002, prior to her detention, Tekle explained that she had been planning to come to the United States prior to her arrest "[b]ecause the conditions in the country had deteriorated. There were rampart [sic] arrests that [we]re occurring to others like me and I d[id]n't want to face the same fate as the others." Her brother's testimony, which the IJ found to be credible, corroborated Tekle's explanation. He confirmed that Tekle had expressed her desire to leave Ethiopia prior to her arrest, "[b]ecause she was involved and her husband was active and the situation there was very dangerous." He testified that after Tekle's release from prison, "we have to accelerate the process for her, because at that time, I, myself, felt that she was facing death. . . . I tried to get involved in a hasty fashion."

**[9]** Moreover, the IJ erroneously failed to address Tekle's explanation. *Kaur*, 379 F.3d at 887 ("An adverse credibility finding is improper when an IJ fails to address a petitioner's explanation for a discrepancy or inconsistency."). Instead, he suggested that Tekle was not credible because prior to her arrest she was already fearful and had the foresight to make some initial departure plans. Tekle's fear that her OLF activities would prompt the police to target her for persecution was subsequently confirmed. Country reports also corroborate the basis for that fear. The evidence compels us to conclude that Tekle's representations about when she decided to flee Ethio-

pia were not inconsistent and were not a proper basis for the IJ's adverse credibility finding.

Conclusion

**[10]** We conclude that the BIA's adverse credibility determination is not supported by substantial evidence. *See Lolong v. Gonzales*, 484 F.3d 1173, 1178 (9th Cir. 2007) (en banc). Because "each of the . . . BIA's proffered reasons for [its] adverse credibility finding fails, we must accept [Tekle's] testimony as credible." *Marcos v. Gonzales*, 410 F.3d 1112, 1116 (9th Cir. 2005) (internal quotation marks omitted).

After concluding that Tekle was not credible, the IJ stated, "if the BIA disagrees with the Court, then the BIA is compelled to grant asylum to the respondent." Then, however, the IJ concluded that, even crediting Tekle's testimony as true, she was not eligible for asylum or entitled to other relief.

Under *INS v. Ventura*, after determining that an adverse credibility finding is not supported by substantial evidence, we ordinarily remand to the BIA to "make the basic asylum eligibility decision." 537 U.S. 12, 16 (2002) (per curiam). *Guo v. Ashcroft*, 361 F.3d 1194, 1203-04 (9th Cir. 2004), suggests that where, as here, the IJ finds in the alternative that the petitioner is not eligible for asylum, "we are not required to remand under *Ventura* for a determination on that issue." *See also Almaghzar*, 457 F.3d at 923 n.11 ("*Ventura* and *Thomas* require that we remand when the agency has not yet considered the issue. But we here hold that the IJ and BIA decided the merits of Almaghzar's [Convention Against Torture] claim, with the benefit of the country condition reports Almaghzar introduced into evidence, and the IJ generally said that he had considered all evidence. Neither *Ventura* nor *Thomas* require[s] us to remand an issue to the agency when the agency has already considered the issue."). However, in *Guo* and *Almaghzar* the BIA had affirmed the IJ's decision in

its entirety. *See Almaghzar*, 457 F.3d at 919-20, 923 n.11; *Guo*, 361 F.3d at 1199.

**[11]** We hold that where, as here, the IJ has made an adverse credibility finding and has also concluded in the alternative that petitioner is ineligible for asylum or other relief, and the BIA has affirmed on the basis of the IJ's adverse credibility finding, but has specifically declined to reach the issue of eligibility for asylum and other relief, we must remand under *Ventura*. The agency has not made a final determination of Tekle's eligibility for asylum or entitlement to withholding of removal or relief under the Convention Against Torture. We must not make that determination ourselves, absent some "special circumstance . . . that might . . . justif[y] the Ninth Circuit's determination of the matter in the first instance." *Gonzales v. Thomas*, 547 U.S. 183, 187 (2006) (per curiam); *see also Chen*, 362 F.3d at 622 (noting that the Ninth Circuit has recognized only two such "rare" exceptions). A *Ventura* remand is particularly necessary here, in light of the IJ's contradictory statements about Tekle's eligibility for asylum.

If the BIA determines that an IJ must conduct additional fact finding, we suggest that the BIA remand to a different IJ. *See Arulampalam v. Ashcroft*, 353 F.3d 679, 688-89 (9th Cir. 2003); *Paramasamy v. Ashcroft*, 295 F.3d 1047, 1055 n.4 (9th Cir. 2002); *Garrovillas v. INS*, 156 F.3d 1010, 1016 n.4 (9th Cir. 1998); *see also Zehatye v. Gonzales*, 453 F.3d 1182, 1194-96 (9th Cir. 2006) (Berzon, J., dissenting). We note that the IJ twice implored the BIA not to remand Tekle's case to him. The IJ stated that he "wishes to emphasize that if the BIA disagrees with the Court, then the BIA is compelled to grant asylum to the respondent. If the case, for any reason, is remanded to the Court, the Court will recuse himself because the Court has concluded that the respondent did not provide truthful testimony today for her asylum application[.]" He later stated:

> Once again, the Court wishes to emphasize that if in the view of the Board, the determination made by the

Court in its analysis, either as to credibility or as to eligibility for asylum is in error, then it behooves the Board to make such a determination as opposed to further remanding the matter. Since the responsibility of the Board is to hear and decide even if only on the existing record, particularly where such a thorough record has been made, not only on the basis of the documentary evidence and the transcript, but this herculean oral decision of well in excess of one hour and 15 minutes by the Court today, in an effort to show the seriousness with which the Court has taken to heart recent advisals by the Board at our training in June [2004] as to the inadequacy of most oral decisions, particularly when it comes to adverse credibility determinations.

For the foregoing reasons, we GRANT Tekle's petition for review and REMAND to the BIA for further proceedings consistent with this opinion.