**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| YONGGUO LAI, AKA Yonghuo Lai, *Petitioner*, | No. 10-73473 |
| | Agency No. A099-447-649 |
| v. | |
| ERIC H. HOLDER, JR., Attorney General, *Respondent*. | ORDER AND AMENDED OPINION |

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
May 13, 2014—Pasadena, California

Filed August 25, 2014
Amended November 4, 2014

Before: Kim McLane Wardlaw and Raymond C. Fisher,
Circuit Judges, and Kent J. Dawson, District Judge.[*]

Order;
Opinion by Judge Fisher

---

[*] The Honorable Kent J. Dawson, United States District Judge for the District of Nevada, sitting by designation.

## SUMMARY[**]

### Immigration

The panel amended an opinion filed August 25, 2014, and published at 764 F.3d 1098, granting a petition for review of the Board of Immigration Appeals' denial of asylum, withholding of removal, and protection under the Convention Against Torture.

The panel held that substantial evidence did not support the IJ's adverse credibility determination, where it relied on petitioner's omission until cross-examination of details concerning third parties, which were not contradictory to his earlier testimony or application materials. The panel also held that lack of corroborating evidence did not support the adverse credibility determination, and applying *Ren v. Holder*, 648 F.3d 1079 (9th Cir. 2011) and *Zhi v. Holder*, 751 F.3d 1088 (9th Cir. 2014), concluded that the IJ erred by failing to give petitioner notice and an opportunity to present corroborating evidence.

After the panel issued its opinion, the government moved to delete the panel's discussion of *Zhi* and *Ren*, arguing that *Ren*'s notice-and-opportunity requirement applies only in the case of an applicant deemed credible by the IJ. The panel denied the government's motion, and amended the opinion to explain that *Ren*'s notice requirements apply where, as here, the IJ found the petitioner not credible, and relied on the lack of corroboration as part of that overall credibility

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

determination, and, on review, this court rejected each of the IJ's other reasons for the adverse credibility finding.

## COUNSEL

Thomas J. Tarigo, Los Angeles, California, for Petitioner.

Tony West, Assistant Attorney General, Terri J. Scadron, Assistant Director, Siu P. Wong and Timothy Hayes (argued), Trial Attorneys, United States Department of Justice, Civil Division, Office of Immigration Litigation, Washington, D.C., for Respondent.

## ORDER

The government's motion to amend opinion, filed October 7, 2014, is **DENIED**.

The opinion filed August 25, 2014, and published at 764 F.3d 1098, is **AMENDED**. An amended opinion is filed concurrently with this order.

The time for filing a petition for panel rehearing or rehearing en banc commences anew upon the filing of the amended opinion. *See* Fed. R. App. P. 35(c), 40(a)(1).

## OPINION

FISHER, Circuit Judge:

Yongguo Lai, a native and citizen of China, petitions for review of a decision by the Board of Immigration Appeals (BIA). The BIA dismissed Lai's appeal from an immigration judge's (IJ) decision denying his application for asylum, withholding of removal and protection under the Convention Against Torture (CAT). The BIA relied on the IJ's finding that Lai's claim of persecution and torture on account of his Christian religion was not credible. The IJ based her adverse credibility ruling, in relevant part, on Lai's testimony during cross-examination that contained information the IJ found to be missing from and inconsistent with Lai's initial written application and direct testimony, and uncorroborated in one respect. We hold that the BIA's adverse credibility determination is not supported by substantial evidence. Accordingly, we grant the petition and remand to the BIA for further proceedings.

## I. Background

In a written statement included with his initial application, Lai explained that he started practicing Christianity a few years after he lost his job as a factory worker in Fushun, China. He began going to church with his wife, and was baptized on December 24, 2004. According to Lai's statement, on July 17, 2005, police searched and detained Lai as he arrived at a gathering place in a suburb of Fushun to listen to a Korean preacher. Lai and other church members were taken to a police station, where Lai was beaten and interrogated twice. Lai's wife paid for him to be released after 10 days, at which time the police told Lai that he could

not mention his detention to anyone and that he could no longer participate in such "illegal gatherings." Lai also had to regularly report to the police station after his release. In his statement, Lai also wrote that his wife told him the police had come to their home in China looking for him several times after he arrived in the United States.

Lai left China for the United States in November 2005. He then applied for asylum, withholding of removal and protection under CAT, claiming persecution on account of his religion. Lai testified before the IJ in August 2008, and his direct testimony, in large part, reiterated his initial written statement. However, during cross-examination by the government's attorney and questioning by the IJ, Lai revealed information not included in his written statement – or in his direct testimony. First, Lai said that after arriving in the United States he called a fellow church member in China, Yan Li, who told him that she had been detained for more than six months. Second, Lai said that his wife had recently been arrested. Lai further explained that his wife was forced to sign a paper promising that she would tell the Chinese government if she received any information about Lai's whereabouts, and that she now had to visit the police station on a weekly basis. Third, Lai told the IJ that all of his fellow practitioners were arrested or persecuted after he came to the United States.

The IJ denied all three of Lai's claims for relief. The IJ found that Lai's testimony was not credible, citing: (1) Lai's failure to include "key events" mentioned during cross-examination in his written statement or direct testimony; (2) Lai's ability to leave China without problems, when the country conditions report indicated that illegal religious activities ordinarily would have been a basis for denying exit

authority; and (3) evidence demonstrating that Lai was "at best a Christian of convenience." The BIA dismissed Lai's appeal, finding no clear error in the IJ's adverse credibility determination and citing Lai's failure to mention his wife's arrest and Li's detention in his written application. The BIA also noted Lai's failure to provide corroborating evidence from his wife about her recent experiences.

## II. Discussion

### A. Standard Of Review

"We review factual findings, including adverse credibility determinations, for substantial evidence." *Garcia v. Holder*, 749 F.3d 785, 789 (9th Cir. 2014). Where, as here, the BIA reviewed the IJ's credibility-based decision for clear error and "relied upon the IJ's opinion as a statement of reasons" but "did not merely provide a boilerplate opinion," we "look to the IJ's oral decision as a guide to what lay behind the BIA's conclusion." *Tekle v. Mukasey*, 533 F.3d 1044, 1051 (9th Cir. 2008) (alterations and internal quotation marks omitted). "In so doing, we review here the reasons explicitly identified by the BIA, and then examine the reasoning articulated in the IJ's oral decision in support of those reasons." *Id.* "Stated differently, we do not review those parts of the IJ's adverse credibility finding that the BIA did not identify as 'most significant' and did not otherwise mention." *Id.*

### B. Substantial Evidence Does Not Support The Adverse Credibility Finding

Lai contends that substantial evidence does not support the BIA's adverse credibility determination. We agree.

**1.**

In a post-REAL ID Act case, an IJ making a credibility finding "consider[s] the totality of the circumstances, and all relevant factors," and may base the determination on:

> the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim . . . .

8 U.S.C. § 1158(b)(1)(B)(iii). "The IJ must provide a specific cogent reason for the adverse credibility finding, but we will only overturn the IJ's conclusion when the evidence compels a contrary result." *Garcia*, 749 F.3d at 789 (citations and internal quotation marks omitted). We have noted that "the REAL ID Act requires a healthy measure of deference to agency credibility determinations," which "makes sense because IJs are in the best position to assess demeanor and other credibility cues that we cannot readily access on review." *Shrestha v. Holder*, 590 F.3d 1034, 1041 (9th Cir.

2010). But "the REAL ID Act does not give a blank check to the IJ enabling him or her to insulate an adverse credibility determination from our review of the reasonableness of that determination." *Id.* at 1042.

In evaluating inconsistencies – which may be a basis for an adverse credibility determination under § 1158(b)(1)(B)(iii) – "the relevant circumstances that an IJ should consider include the petitioner's explanation for a perceived inconsistency, and other record evidence that sheds light on whether there is in fact an inconsistency at all." *Id.* at 1044 (citation omitted). "To ignore a petitioner's explanation for a perceived inconsistency and relevant record evidence would be to make a credibility determination on less than the total circumstances in contravention of the REAL ID Act's text." *Id.*

At times, we have recognized that an omission may form the basis for an adverse credibility finding. *See, e.g.*, *Zamanov v. Holder*, 649 F.3d 969, 974 (9th Cir. 2011) ("Zamanov's supplemental declaration and his testimony before the IJ tell a much different – and more compelling – story of persecution than his initial application and testimony before the asylum officer. . . . While Zamanov's earlier story cited only the police break-in to his home and Major Babaev's threats and extortion as evidence of persecution, the additions described his activities serving as a poll watcher and protesting the government's alleged falsification of election results."); *Husyev v. Mukasey*, 528 F.3d 1172, 1183 (9th Cir. 2008) ("The inconsistency – or, to be more accurate, the omission – identified by the IJ consists of Husyev's failure to mention in his asylum application and interview the fifteen speeches that he gave in Ukraine in the early 1990s to denounce the persecution of ethnic minorities at the hands of

Ukranian ultra-nationalists. We conclude that the IJ's adverse credibility determination is supported by substantial evidence."); *Alvarez-Santos v. INS*, 332 F.3d 1245, 1253–55 (9th Cir. 2003) ("It is simply not believable that an applicant for asylum would fail to remember, and thus to include in either of his two asylum applications or his principal testimony, a dramatic incident in which he was attacked, stabbed, and fled to the mountains – the very incident that precipitated his flight from Guatemala – only to be reminded of it at the conclusion of his testimony, after taking a break, and, assertedly, because of an itch in his shoulder." (emphasis omitted)).

In general, however, omissions are less probative of credibility than inconsistencies created by direct contradictions in evidence and testimony. It is well established that "'the mere omission of details is insufficient to uphold an adverse credibility finding.'" *Singh v. Gonzales*, 403 F.3d 1081, 1085 (9th Cir. 2005) (alteration omitted) (quoting *Bandari v. INS*, 227 F.3d 1160, 1167 (9th Cir. 2000)); *see also Arulampalam v. Ashcroft*, 353 F.3d 679, 688 (9th Cir. 2003) ("Nor does Arulampalam's omission at the airport of specific details about his torture that were later revealed in his testimony support the adverse credibility finding. The airport interview was fully consistent with Arulampalam's later testimony; the only difference was the level of detail."); *Lopez-Reyes v. INS*, 79 F.3d 908, 911 (9th Cir. 1996) ("It is well settled that an applicant's testimony is not per se lacking in credibility simply because it includes details that are not set forth in the asylum application.").

In affirming the IJ's adverse credibility finding, the BIA relied on two omissions that it characterized as "significant *inconsistencies* between the respondent's testimony and the

statement attached to his asylum statement." First, the BIA cited Lai's answer to a government question about Lai's later contacts with his fellow church members. He responded that one, Yan Li, had told him she had been detained for more than six months. Lai did not volunteer this information as part of his direct testimony. Instead, it surfaced as part of the government's detailed questioning during cross-examination:

> Q. Did you ever have any contact with any of these people ever again?
>
> A. After I came to the United States, I called them.
>
> Q. And, sir, who did you call?
>
> A. Yan Li, Y A N  L I.
>
> Q. And what did she say, sir?
>
> A. You know, she said don't come back ever.
>
> Q. Do you know when she was released from prison, sir?
>
> A. She was detained for more than six months. She didn't tell me exactly when she was released, but she was jailed for more than half a year.

Neither the government nor the IJ asked Lai to explain why he had omitted information about Li's detention earlier or suggested to him that his answer was substantively inconsistent with his prior statements.

Second, and more significantly, the BIA relied on Lai's testimony that his wife was recently arrested. Again, the government elicited this information during cross-examination. It was not part of Lai's direct testimony:

> Q. Does [sic] your wife and daughter still live in the same house that you lived in when you were living in China, sir?
>
> A. No, not now.
>
> Q. Where do they live now?
>
> A. They live with my wife's mother.
>
> Q. Why did they move in with your wife's mother?
>
> A. The police would often come to harass them.
>
> . . .
>
> Q. Did they have any problems with the police since they moved to this house?
>
> A. Yes.
>
> Q. What happened?
>
> A. The police, you know, went to her mother's place for harass them, and just (indiscernible) months ago, my wife was arrested.

. . .

Q. Why was she arrested?

A. They felt that I betrayed my country. I escaped to a foreign country.

. . .

Q. And what happened then, sir?

A. She was asked to write on a piece of paper to promise that she would tell the government if she receive any news from me or if she knows my whereabouts.

. . .

Q. And, sir, is she now attending weekly visits – does she now have to go to weekly meetings at the police station?

A. Yes.

In this instance, the IJ asked Lai why he did not include this information in his written statement. Lai explained that the arrest occurred "quite recently." The IJ then asked Lai why he failed to update his application earlier in the hearing:

Q. Okay. And today I put you under oath and asked you if everything in that application is true and correct. Do you remember that?

A. Yes.

Q. And I asked if you wanted to update anything in your declaration or application, and you said no?

A. Oh, yeah. There's nothing need to be corrected in my application.

Q. So you don't think it would have been important in your declaration to tell the Court that your wife was arrested recently because of you?

A. No. I only found out quite recently, the past couple of days when I called home. And also I assume, you know, when you asked me whether I need to make any corrections, you know, I'm assuming you want to find out if the materials supplied are true which are. Maybe I did not comprehend it properly. Sorry.

Lai's explanation was consistent with what he was asked earlier in the day. The IJ had asked Lai at the beginning of the hearing whether his application was "true and correct";

she did not ask whether it was "complete."[1]   Thus, his
responses at the outset were accurate.

The IJ nonetheless summarily rejected Lai's explanation,
simply concluding that Lai was not persuasive, that the
omitted information was "clearly material" and that it went to
the heart of Lai's claim.  Again, she did not explain what, if
anything, about Lai's answers was substantively inconsistent
with his written statement or direct testimony – only that his
failure to mention these events "seriously undermines his
credibility."

The government suggests that the late disclosure of such
information was a sound basis for questioning Lai's
credibility because it was likely a scripted, last-minute
attempt to enhance Lai's persecution claim.  *See, e.g.*,
*Alvarez-Santos*, 332 F.3d at 1254.  Aside from the IJ's and
BIA's failure to articulate this rationale, the argument is
flawed for three reasons.

First, this new information was introduced – sometimes
bit by bit – through very specific cross-examination questions

---

[1] Even if the IJ had asked Lai at the beginning of his hearing whether his
application was "complete," we doubt the effectiveness of this question –
or of any compound question with this as a component, such as whether
his application was "true, complete and correct" – as an unambiguous way
to elicit additional information.  Such questions are imprecise and subject
to differing interpretations, especially for non-native English speakers or
individuals working with a translator.  The IJ did not ask Lai at the
beginning of his hearing whether he had additional information about
members of his family being targeted because of him.  Thus, even if the
IJ had asked in general whether Lai's application was complete, the
omission of this information concerning his wife would not have been
unresponsive or untrue.

from the government, not through Lai volunteering it to support his claim. It is difficult to see how Lai could have scripted a last-minute attempt to bolster his claim in response to these specific questions, sprung on him in the course of the hearing. There is no reason why, if Lai was indeed trying to artificially bolster his claim, he would have waited to do so until after his direct testimony that he and his attorney could have controlled, while hoping the government would create the openings to reveal the new information. *See id.* at 1248–49 ("At the very end of his direct testimony, after a short break, Alvarez-Santos was asked by his attorney if he had anything else to add. He then proffered for the first time the following story . . . ."). Moreover, the additional information in Lai's case was supplemental rather than contradictory. None of it contradicted any of Lai's other evidence or testimony. His failure to mention the information earlier in the process meant there were omissions, but not substantive inconsistencies.

Second, the information concerned events and adverse consequences for third parties, not for Lai himself. *Cf., e.g.*, *Zamanov*, 649 F.3d at 972 (the applicant initially omitted three instances of mistreatment that he himself experienced, including beatings and arrests); *Husyev*, 528 F.3d at 1177 (the applicant initially failed to mention that he gave 15 speeches, which made him a target); *Alvarez-Santos*, 332 F.3d at 1248–49 (at the end of his direct testimony, after a short break and in response to his attorney asking whether he had anything to add, the applicant mentioned for the first time that men came to his house, caught him and stabbed him). Here, the omitted information concerned Lai's fellow church member's detention and his wife's arrest, both of which he learned about after arriving in the United States. Because asylum claims ordinarily are centered around events and

circumstances that the applicants have experienced directly, the initial omission of incidents affecting only third parties is less probative of credibility.

Third, Lai gave a plausible and compelling explanation for the omission of his wife's arrest: the arrest occurred shortly before he testified, and he did not understand that he should have added information about *her* at the beginning of his hearing dealing with his own circumstances. *See Shrestha*, 590 F.3d at 1044 ("[I]n evaluating inconsistencies, the relevant circumstances that an IJ should consider include the petitioner's explanation for a perceived inconsistency, and other record evidence that sheds light on whether there is in fact an inconsistency at all." (citation omitted)). The BIA noted that Lai "was afforded ample opportunity to amend or add to his application at the beginning of his merits hearing," and that "he swore to the accuracy of his application, declaration, and supporting documentation." But the IJ did not clearly address the need to add this type of information, such that Lai reasonably could have been expected to mention the information earlier. And, as we have said, the information did not conflict with the rest of Lai's application or cast doubt upon the accuracy of it. Moreover, Lai was never asked to explain the omission concerning Yan Li's detention. *See Singh*, 403 F.3d at 1085 ("Where an asylum applicant is denied a reasonable opportunity to explain what the IJ perceived as an inconsistency in her testimony, the IJ's doubt about the veracity of her story cannot serve as a basis for the denial of asylum." (alterations and internal quotation marks omitted)).

In sum, the record compels the conclusion that the IJ's reliance on Lai's answers to her own questions and those of the government that elicited new information was flawed.

This is not a case where contradictory or even impeaching information came out; rather, it was information consistent with Lai's own claimed experiences that would have helped his claim had he brought it out himself. Given his plausible and understandable confusion about the relevance to his own claim of persecution, it is implausible to find – as the government suggests – that Lai's omissions were part of a scheme to enhance his claim at the last minute by waiting for the government to bring the helpful information to the IJ's attention during its cross-examination. Had the IJ made a clearer inquiry at the hearing's outset about the nature and scope of new or supplemental information Lai was being asked about, we might have a different case.

On this record, we hold that, to the extent the BIA's decision relies on Lai's omissions as the basis of the IJ's finding of "significant inconsistencies" between Lai's written statement and his testimony, substantial evidence does not support the adverse credibility determination.[2] We also hold

---

[2] Under *Tekle*, we evaluate only the portions of the IJ's adverse credibility finding that the BIA relied on. *See* 533 F.3d at 1051. As in *Tekle*, however, we note that the other portions of the IJ's decision also would fail to support the adverse credibility finding. *See id.* at 1051 n.3 ("The BIA had good reason to decline to rely on the IJ's other four grounds.").

The IJ, for instance, cited Lai's assertion that all of his fellow practitioners were arrested or persecuted after he came to the United States. This information also was omitted from Lai's written statement and direct testimony; again, it came in response to a question posed by the IJ. Moreover, when the IJ asked why Lai did not include this information in his written statement, Lai adequately explained that he "just put down, you know, the facts about this case, you know. I was not asked about this." As with the information concerning Lai's wife and Li's detention,

that the BIA's rejection of Lai's explanation for not amending or adding to his application at the outset of the IJ hearing was erroneous for the reasons set forth above.

**2.**

In affirming the IJ's adverse credibility finding, the BIA noted Lai's failure "to provide sufficient corroboration for his claims of fearing persecution because of his Christian religion if returned to China." More specifically, the BIA wrote that "[t]he Immigration Judge also noted the lack of any corroborating evidence from his wife, who has first-hand knowledge of the events described by the respondent." The IJ's reference to lack of corroborating evidence related to Lai's wife's arrest.

---

the government's argument regarding a scripted, last-minute attempt to bolster Lai's claim fails.

Additionally, the IJ referred to Lai as "a Christian of convenience." This, however, does not follow from Lai's testimony "that he tries to attend services once a week, but if he has work projects that require his presence, he forgoes the church services for work." *See Ren v. Holder*, 648 F.3d 1079, 1087 (9th Cir. 2011) ("That Ren must occasionally miss church services in order to sustain his livelihood, or that he gets a ride to church rather than taking the bus, in no way undermines the genuineness of his belief or the importance to him of living in a country where he can freely practice his religion."). Finally, the IJ's reference to Lai's apparent ability to leave China without problems would not be sufficient on its own to support the adverse credibility finding. *See Zheng v. Ashcroft*, 397 F.3d 1139, 1143 (9th Cir. 2005) ("The IJ may use a country report as supplemental evidence to discredit a generalized statement made by the petitioner but not to discredit specific testimony regarding his individual experience." (internal quotation marks omitted)).

We also hold that the lack of corroboration cited by the IJ and BIA does not support the BIA's adverse credibility determination. The reliance on a lack of corroborating evidence is flawed for several reasons. First, Lai was not relying on his wife's circumstances to prove *his* asylum claim. Lai's testimony regarding his wife's arrest surfaced on cross-examination, not on direct, and it is therefore unsurprising that Lai did not corroborate the arrest. An applicant's credibility cannot be challenged on the ground that he failed to anticipate the need to corroborate testimony he did not intend to give. Second, even if the lack of corroboration of the arrest were somehow probative of Lai's credibility, it was unreasonable for the BIA to expect that Lai could have provided corroboration under the circumstances here. Lai testified that he learned about his wife's arrest just days before his hearing, making it all but impossible for him to produce corroborating evidence in time for the hearing.

For these reasons, Lai's failure to corroborate his testimony about his wife's arrest does not support the adverse credibility determination. Even if it did so, however, the BIA's reliance on it was procedurally improper because Lai "was never put on notice that he needed to produce the corroborative evidence identified by the IJ in her oral decision." *Zhi v. Holder*, 751 F.3d 1088, 1094 (9th Cir. 2014) (internal quotation marks omitted). Under *Zhi*, an IJ must provide an otherwise credible applicant such as Lai with "'notice and an opportunity to either produce the evidence or explain why it is unavailable.'" *Id.* (quoting *Ren v. Holder*, 648 F.3d 1079, 1090–92 & n.13 (9th Cir. 2011)). Here, as in *Zhi*, "the IJ erred because she did not provide notice to [Lai] that he was required to present the corroborative evidence she referred to in her decision." *Id.* at 1095. "Nor did the IJ give [Lai] an opportunity [either to produce the evidence or] to

explain why such evidence might be unavailable." *Id.*[3]  The
IJ's actions were therefore improper.  *See id.*[4]

After we filed our opinion, the government moved to
delete our discussion of *Zhi* and *Ren*, arguing that *Ren*'s
notice-and-opportunity requirement applies only in the case
of an applicant deemed credible by the IJ, which is not the
case here.  Mot. 2.  In *Zhi*, however, we applied *Ren* where,
as here: the IJ found the petitioner not credible; the IJ relied
on the lack of corroboration as part of that "overall credibility
determination"; and, on review, we rejected each of the IJ's
other reasons – besides lack of corroboration – for the adverse
credibility finding.  *See Zhi*, 751 F.3d at 1091–95 & n.5.
Under *Zhi*, when an IJ's other reasons for finding an asylum
applicant not credible are not supported by substantial
evidence, the applicant, being "otherwise credible," is entitled
to notice that he needs to produce corroborative evidence and

---

[3] The IJ asked Lai during the hearing whether he had "any . . .
paperwork showing that she was arrested" or "any paperwork showing"
her attendance at "weekly meetings at the police station."  To both, Lai
answered: "No."  The IJ, however, did not ask Lai whether he *could*
produce such corroborating evidence or give him the opportunity to
produce it.  Furthermore, although the IJ's decision faulted Lai for failing
to provide corroborating evidence in the form of "a letter from his wife,"
at the hearing the IJ requested only "paperwork," implying an official
report and not a letter.  Finally, the IJ never asked Lai *why* the
"paperwork" was not provided immediately at the hearing.  *Cf. Zhi*,
751 F.3d at 1093 ("The IJ could not properly base her adverse credibility
determination on Zhi's entry visa without first soliciting his explanation
for why he entered on a B-1 visa. . . .  [By doing so,] she impermissibly
based her conclusions on 'speculation and conjecture,' instead of seeking
an explanation that might have clarified the matter.").

[4] Both *Zhi* and *Ren* were decided after the BIA's decision in this case.
Thus, neither the IJ nor the BIA had the guidance of these precedents.

an opportunity to either produce the evidence or explain why it is unavailable. *See id.* at 1094–95 (citing 8 U.S.C. § 1158(b)(1)(B)(ii) and *Ren*, 648 F.3d at 1090–92 & n.13). Because Lai was not given that notice and opportunity, lack of corroboration cannot sustain the agency's adverse credibility determination.

## III. Conclusion

We hold that the BIA's adverse credibility determination is not supported by substantial evidence. *See Tekle*, 533 F.3d 1055. Because the reasons the BIA provided for the adverse credibility determination fail, we must accept Lai's testimony as true. *See id.* Because the BIA's decision was based on the erroneous conclusion that Lai's testimony was not credible, we remand all three of Lai's claims to the BIA for further proceedings consistent with this opinion.

**PETITION FOR REVIEW GRANTED; REMANDED.**