**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

XIAO LAN ZHENG,
                              *Petitioner,*

v.

JOHN ASHCROFT, Attorney General,
                              *Respondent.*

No. 03-70087

Agency No.
A77-169-033

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued and Submitted
June 10, 2004—Pasadena, California

Filed September 2, 2004
Amended February 15, 2005

Before: Thomas G. Nelson, A. Wallace Tashima and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

The opinion filed at 382 F.3d 993 is amended in full as
follows:

## COUNSEL

David Z. Su, El Monte, California, for the petitioner.

Robbin K. Blaya, United States Department of Justice, Office of Immigration Litigation-Civil Division, Washington, D.C., for the respondent.

## OPINION

FISHER, Circuit Judge:

Xiao Lan Zheng, a citizen of the People's Republic of China, petitions for review of the denial of his applications for asylum and withholding of removal. He claims that local Chinese officials forced his wife, Xiu Qin Wen, to abort their first child because they had not reached the legal age for marriage and were not authorized to have a child. Furthermore, he claims that the officials fined the couple for violating family planning polices and instructed one of them to report for sterilization after Wen's second pregnancy. The Immigration Judge ("IJ") found that Zheng was not credible, and the Board of Immigration Appeals ("BIA") summarily affirmed. We grant the petition for review because substantial evidence does not support the IJ's adverse credibility finding. We conclude, therefore, that Zheng is automatically eligible for asylum, and remand to the BIA to exercise its discretion whether to grant Zheng asylum and to determine in the first instance whether Zheng is eligible for withholding of removal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Zheng testified before the IJ to the following events. He was born in the town of Lunchen in Fuqing city, which is

located in the southeastern province of Fujian. On May 1, 1992 when Zheng was 21 years old, he married Wen who was 19 at the time. They were each respectively one year shy of the legal age for marriage. They had a small, traditional Chinese wedding ceremony but did not apply for a marriage certificate because they were underage. When Wen was five months pregnant, birth control officials forcibly took her from Zheng's family home in Lunchen on October 7, 1992 to have an abortion. Zheng was not home at the time and was working in a different town within Fuqing City. He heard about the incident from his wife's brother the next morning and went home immediately. By the time he arrived home in the afternoon, Wen had already returned from the hospital. She told him that the officials had come to their house late in the evening, taken her to a government building and held her there along with other pregnant women until they took her to the hospital for the abortion the next morning.

Three days later, a town official came to their house and told Zheng that they had to pay a fine of 20,000 RMB[1] for an early marriage and unauthorized pregnancy. They did not pay the fine because of their limited income and because they did not believe they should have to pay the fine after Wen already had been forced to undergo the abortion. Zheng and Wen collectively earned 6,000 RMB annually, with Zheng working as a painter and a bulldozer operator and Wen sewing in a factory. In April 1994, after they had reached the legal age for marriage, they went to the town government office to apply for a marriage certificate but were denied because they had not yet paid the 20,000 RMB fine.

Around October of that year, they discovered that Wen was pregnant again. Because they were afraid that the officials would find out that she was pregnant, they went into hiding in Wen's uncle's house in the town of Funlu. In March 1995, they moved out of her uncle's house but did not return to

---

[1]RMB denotes currency in RenMinBi.

Zheng's home in Lunchen, instead renting a room in Funlu. Their daughter, Yun Zheng, was born on August 15, 1995. In October, after birth control officials learned of the birth of their daughter, an official paid a visit to Zheng's family home in Lunchen and told Zheng's parents to ask Zheng or Wen to go to the government office to be sterilized. They were assessed a second fine of 20,000 RMB because they did not have a marriage certificate or authorization for the birth of their daughter.

In April 1999, Zheng left China for the United States by boat, and a month later, the American Coast Guard intercepted and detained him in Guam. The Immigration and Naturalization Service initiated removal proceedings against him, and he applied for asylum, withholding of removal under INA § 241(b)(3) and relief under the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Convention Against Torture"), *opened for signature* Feb. 4, 1985, art. 3, S. Treaty Doc. No. 100-20 at 20 (1998).

In addition to testifying at his hearing to the events above, Zheng offered into evidence his daughter's birth report, his own notarized birth certificate and a letter from Wen describing what happened the evening she was taken away. Zheng testified that Wen, who was still in China, took the birth reports to the town government office some time in 2000 to get them authenticated, but the office refused to certify them. Nonetheless, the IJ admitted the documents into evidence. The government also offered into evidence the State Department's 1999 Country Reports on Human Rights Practices (the "Country Report") and its 1998 Profile of Asylum Claims and Country Conditions for China (the "Country Profile").

The IJ found that Zheng was not credible because (1) Zheng's testimony that the couple was forced to abort their first child was inconsistent with the Country Report and Profile, which stated that families are permitted to have one child

and maybe two if the first is a female; (2) Zheng's testimony about the amount of the fine for their early marriage and Wen's unauthorized pregnancy was inconsistent with the amount described in the Country Profile; (3) Zheng's testimony was not detailed; (4) his testimony was inconsistent with Wen's letter about the time when the birth control officials took Wen away for the abortion; (5) it was unlikely that Wen would go to the local authorities to get Zheng's birth certificate and Yun's birth report certified and yet be afraid to go to other Chinese officials in order to seek further certification; and (6) it seemed unlikely that both Zheng and Wen would be subjected to sterilization. Accordingly, the IJ denied Zheng's application for asylum.

The IJ stated that because Zheng had "failed to satisfy his burden regarding asylum," he would "not reach the issue of whether or not [Zheng] merits a grant of withholding under [INA] Section 241(b)(3)." The IJ, however, denied Zheng's request for withholding of removal in his final order.[2] The IJ also found that Zheng had failed to satisfy his burden of proof for protection under the Convention Against Torture. The BIA affirmed the IJ's decision without opinion.

## II.  STANDARD OF REVIEW

Given the BIA's summary affirmance, we review the IJ's decision as if it were the BIA's decision. *See Cedano-Viera v. Ashcroft*, 324 F.3d 1062, 1063 n.1 (9th Cir. 2003). We review the IJ's adverse credibility finding under the substantial evidence standard. *Chen v. Ashcroft*, 362 F.3d 611, 617 (9th Cir. 2004). To determine whether substantial evidence

---

[2]Given the IJ's final order, we take the IJ's prior statement to mean that because Zheng had failed to satisfy his burden regarding asylum, Zheng also failed to meet the more stringent burden for withholding of removal, *see Ghaly v. INS*, 58 F.3d 1425, 1429 (9th Cir. 1995), not that the IJ would not reach the issue of whether Zheng was entitled to withholding of removal. Thus, we conclude that the withholding issue is properly before us.

supports the IJ's finding, we "evaluate each ground cited by the [IJ] for [his] finding." *Wang v. Ashcroft*, 341 F.3d 1015, 1021 (9th Cir. 2003).

## III. CREDIBILITY

## A. Inconsistencies with the Country Report and Profile

[1] The IJ may consider the State Department's reports in evaluating a petitioner's credibility. *See Duarte de Guinac v. INS*, 179 F.3d 1156, 1162 (9th Cir. 1999). The IJ may use a country report as "supplemental" evidence to discredit "a generalized statement" made by the petitioner but "not to discredit specific testimony regarding his individual experience." *Chebchoub v. INS*, 257 F.3d 1038, 1043-44 (9th Cir. 2001) (upholding the BIA's reliance on the country report's statement that there were no known instances of enforced exile in Morocco and that the Moroccan government offered self-imposed exiles amnesty, to refute the petitioner's statement that the government commonly forced political dissidents to leave Morocco and to sign a document promising never to return). The IJ, however, may not discredit a petitioner's testimony based on a statement in a State Department report that is itself based on speculation or conjecture. *See Shah v. INS*, 220 F.3d 1062, 1069 (9th Cir. 2000) (stating that the State Department's assertion that "[an Indian political party's] many electoral successes belie the assertion that it is not possible for a [member of that political party] to live peaceably in India" amounted to "nothing more than that office's speculation about the effect [that political party's] electoral gains will have on existing political persecution"). Moreover, as a predicate, the petitioner's testimony must be inconsistent with facts contained in the country report or profile before the IJ may discredit the petitioner's testimony. We conclude that there are no inconsistencies here.

### 1.   Forced abortion of first child

The IJ found that the Country Report and Profile were inconsistent with Zheng's testimony that Wen was forced to abort their first child. Specifically, the IJ stated,

> The *Country Reports* and the Profile are devoid of any reports regarding a couple required to undergo an abortion when they had no children at all. In fact, the *Country Reports* seem inconsistent with [Zheng's] rendition of the facts . . . in that the first child is allowed, and it is only after one child has been born and a second child is anticipated that an abortion might become probable. In fact, since [Zheng's] first child was a daughter it seems further unlikely that he and his wife would have been required to undergo an abortion since the policy seems to be that they would be permitted to apply for a second child.

The IJ relied on the following description of family planning policies in Chinese urban areas:

> *Fujian Province* — The policy is generally a one-child policy. However, in some southern urban areas, if the parents' first child is female, they may apply after a set number of years (usually 4) to conceive a second child in the hope that it will be male. Fujian province's lax enforcement of family planning rules has been criticized in the official press.

Country Profile at 21.[3]

---

[3]The IJ also relied on a similar description in the Country Profile regarding family planing policies in *rural* areas of China. *See* Country Profile at 22. However, Zheng testified that Lunchen was in an *urban* area. Thus, the Country Profile's description of family planning policies in rural areas, without more, cannot support the IJ's finding of an inconsistency.

**[2]** However, this policy does not necessarily apply to couples who are not legally married. Rather, different rules apply to unmarried couples. For instance, the Country Report says, "Unmarried women cannot get permission to have a child." *See* Country Report, *available at* http://www.state.gov/www/ global/human_rights/1999_hrp_report/china.html (last visited July 14, 2004). Thus, even though married couples are permitted to have one child and maybe even two if their first child is a girl, unmarried couples are not permitted to have any. Because Zheng and Wen were not legally married, the town officials may have prohibited them from having any children, essentially treating them as an unmarried couple. Moreover, the Country Report states, "The U.S. Consulate General in Guangzhou is not aware of any forced abortions of . . . children of couples with an early marriage (but could not exclude the possibility)." Because the Country Report explicitly acknowledges the possibility of such a forced abortion, Zheng's testimony that Wen was forced to abort their child is not inconsistent with that report.

Furthermore, according to the Country Report and Profile, China does not have a uniform family planning policy across the country. Rather, these policies vary from region to region and township to township because they are implemented through local regulations. *See* Country Report ("The national family planning policy is implemented through provincial and local regulations."); Country Profile at 21 ("Family planning committees are generally in place down to the township level, but implementation at the village level, which is relevant to most asylum applicants, is the responsibility of local officials."). Although the Country Profile tries to capture some of the variation from locality to locality by breaking up its descriptions into regions, it is not so comprehensive as to describe the polices and practices in each city, let alone each township or village. Thus, the policies described in the Country Report or Profile for each region must be read in light of local variation in policies.

**[3]** The Country Report and Profile also acknowledge that abuses occur and corrupt officials may deviate from the official policy. For instance, the Country Profile says, "The Government prohibits the use of force to compel a person to submit to abortion or sterilization," but later states, "Poor supervision of local officials who are under intense pressure to meet family planning targets sometimes results in abuse such as forced abortion and sterilization." Country Profile at 25. Similarly, the Country Report says, "In a meeting with foreign diplomats, [a] senior official did not deny that abuses may have occurred, but insisted that coercion was not the norm, nor government policy . . . ." Therefore, regardless of what the official policy may be in a particular township regarding the number of children a couple is allowed to have, it is possible that corrupt officials may deviate from that policy and force a couple to abort their child even if the couple has not surpassed the legally permissible number of children. In sum, when read in proper context, the Country Report and Profile are not inconsistent with Zheng's testimony that Wen was forced to undergo an abortion.[4]

### 2. Amount of fine for unauthorized child

The IJ found an inconsistency between Zheng's testimony about the amount of fines levied against him and the amount described in the Country Profile. The IJ stated, "[I]t seems

---

[4]To the extent the IJ's statement that it is "unlikely that [Zheng] and his wife would have been required to undergo an abortion" because their "first child was a daughter" can be read as referring to Wen's abortion in 1992, it is logically flawed. *See Gui v. INS*, 280 F.3d 1217, 1225 (9th Cir. 2002) ("[W]e . . . determine whether the reasoning employed by the IJ is fatally flawed."). Although Zheng's and Wen's first *born* child in 1994 was a girl, the record neither indicates the gender of the first *unborn* child in 1992 nor shows that the local officials knew the gender of the fetus before they took Wen away for the abortion. That Zheng and Wen's child in 1994 was a girl could not have affected whether Wen would have been required to undergo an abortion *in 1992* before their daughter had even been conceived.

that the policy is for a one time fine of twenty to forty percent of their annual income. [Zheng] testified that he and his wife were fined 20,000 RMB. That seems like an exorbitant amount considering the fact that [Zheng] testified that his annual income was simply no more than 6,000 RMB."

The IJ relied on a description in the Country Profile under the subheading "Zhejiang Province," which states, "[C]ouples that are *not underage* but cohabit and have an unauthorized child are liable to a one-time fine of 20 to 40 percent of their annual income." Country Profile at 23 (emphasis added). By its plain language, this passage does not describe the fine for couples who *are* underage. Thus, it is not inconsistent with Zheng's testimony because Zheng and Wen were an underage couple. Nonetheless, under the same subheading, the Country Profile previously states, "If [couples under the legal age for marriage] have a child they are liable to a fine of between 20 and 50 percent of their annual income until they legally register their marriage." *Id.* A fine of 20,000 RMB would still be significantly greater than 20 to 50 percent of Zheng's and Wen's annual income.

**[4]** The subheading, however, indicates that the descriptions quoted above are referring to the amount of the fine in Zhejiang province, not Fujian province. Because family planning policies can vary significantly from region to region in China, the Country Profile's description of the fine amount in Zhejiang province does not create an inconsistency with Zheng's testimony because Zheng lived in Fujian province.

**[5]** Indeed, the Country Report and Profile describe much higher fines in Fujian. Under the subheading "Fujian Province," the Country Profile says, "The standard fine is twice a family's gross annual income." Country Profile at 26. The Country Report gives an even higher amount: "In Quanzhou, Fujian province, the fine for violating birth quotas is three times a couple's annual salary . . . ." A fine of 20,000 RMB is roughly three times Zheng's and Wen's combined annual

salary of 6,000 RMB. The amount of Zheng's fine and the amount described in the Country Report and Profile are not significantly different.

To the limited extent that the amounts differ, Zheng's testimony is not inconsistent with the Country Report and Profile because they contain two other facts that could reasonably account for the difference in amount. First, the Country Report acknowledges that family planning fines vary depending on locality. *See* Country Report ("Fines for giving birth without authorization vary . . . ."). Thus, the fine amount in the town of Lunchen could be slightly higher or lower than in other towns or cities in Fujian province. Second, the Country Report recognizes that family planning fines are subject to abuse by corrupt officials. *See id.* ("Corruption related to family planning fines is a widespread problem."). Hence, corrupt town officials may have demanded that Zheng and Wen pay a fine higher than the amount authorized by local regulations.

### 3. Sterilization of both Zheng and Wen

The IJ found it "unlikely that both [Zheng] and his wife would be subjected to sterilization," reasoning that "the policy in China for a couple who have had more than one child [is] that one of the couple be sterilized." According to the Country Profile, "there is no requirement that a specific member of the couple have the appropriate sterilization procedure, but generally it is the women who have the procedure performed." Country Profile at 24. However, Zheng's testimony is not inconsistent with the Country Profile, because Zheng never testified that *both* he and Wen were required to be sterilized. Rather, he testified that town officials told his parents to "ask myself *or* my wife to go to the office and be sterilized." (Emphasis added). The government concedes that the IJ misstated Zheng's testimony.

## B. Lack of detail

**[6]** The IJ remarked that Zheng's "testimony was not terribly detailed." The IJ did not elaborate further or identify any examples of how Zheng's testimony lacked detail. On the contrary, Zheng's testimony in the record was fairly detailed. He recalled the dates of all the relevant events and even the time of day regarding major events, such as when he arrived home after he learned about Wen's forced abortion. He identified specific locations and addresses of where they hid to elude the birth control officials. Although Zheng did not describe the 1992 abortion incident in great detail, he testified that he was not at home when it happened. Even though he did not witness the incident firsthand, he still conveyed several details that he learned from his wife such as what time Wen was taken, where she was taken to and the manner in which the officials sedated her for the abortion.[5] The IJ erroneously faulted Zheng for not providing further details. *See Akinmade v. INS*, 196 F.3d 951, 957 (9th Cir. 1999) ("[T]he IJ erroneously faulted [the petitioner] for not providing further details about the location and manner of his arrest and his mistreatment by the police").

## C. Inconsistency regarding time

**[7]** The IJ noted an inconsistency between Zheng's testimony and Wen's letter regarding the time when officials took Wen away for the abortion: "[Zheng] said that the birth control officials came to his house at 1:00 a.m. in the morning and took his wife[,] [w]hereas the wife's letter states that the birth control officials came to his house about 11:00 p.m." Even assuming that the IJ is correct about the inconsistency in time,[6] a discrepancy of two hours is a minor inconsistency

---

[5] Wen provided many more details about what happened in her letter.

[6] When Zheng testified that "it was about 1:00 a.m.," it is unclear whether he was referring to the time that the officials came to his family home or the time that Wen was being held in the government building with the other women.

that cannot support an adverse credibility finding. *See Vilorio-Lopez v. INS*, 852 F.2d 1137, 1142 (9th Cir. 1988) (concluding that inconsistencies between petitioner's and his cousin's testimony regarding the year when they were chased by a right-wing death squad and how long they hid in a third man's home that evening were "minor inconsistencies" that were "not an adequate basis for an adverse credibility finding").

### D. Implausibility of Wen's authentication attempts

**[8]** The IJ expressed doubt as to the plausibility of Zheng's testimony due to an apparent inconsistency in his description of how Wen attempted to get certain documents certified. Specifically, the IJ stated,

> [Zheng] testified . . . that his wife took [his birth certificate] and their daughter's birth certificate to the Chinese officials in a local town and was refused to get them certified . . . . It seems inconsistent then that she would go to the local authorities who were the ones that allegedly persecuted her in the first place and then be afraid to go to other Chinese officials in order to get them further certified.

Zheng did not testify, however, that there were other Chinese officials who could have certified the documents or that Wen was afraid to go to such officials. Thus, there is no inconsistency in his testimony.

## IV. REMAND

**[9]** Having held that the IJ's adverse credibility finding is not supported by substantial evidence, we must decide whether to rule on Zheng's eligibility for asylum and withholding of removal ourselves or whether to remand to the BIA to make these determinations. When the BIA has not considered an issue, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation

or explanation." *INS v. Ventura*, 537 U.S. 12, 16 (2002) (internal quotation marks omitted).

**[10]** "Under *Ventura*, when we reverse the BIA's adverse credibility determination, we must ordinarily remand the case so that the BIA can determine whether the applicant has met the other criteria for [asylum] eligibility." *He v. Ashcroft*, 328 F.3d 593, 604 (9th Cir. 2003). However, we have recognized that remand for a determination of asylum eligibility is not necessary when the petitioner is "automatically eligible for asylum" if his testimony is believed. *Id.*; *see Ge v. Ashcroft*, 367 F.3d 1121, 1127 (9th Cir. 2004); *Wang*, 341 F.3d at 1023. A person whose spouse has been forcibly sterilized or forced to have an abortion is automatically eligible for asylum. *See Ge*, 367 F.3d at 1127; *He*, 328 F.3d at 604. Thus, if Zheng's testimony that Wen was forced to have an abortion of their child is believed, he is necessarily eligible for asylum.

**[11]** It does not matter that Zheng and Wen are not legally married under China's restrictive marriage laws, because those restrictions are "an integral part of China's coercive population control program." *Ma v. Ashcroft*, 361 F.3d 553, 559 (9th Cir. 2004) (internal quotation marks omitted). Zheng and Wen could not have obtained a marriage certificate at the time of their wedding ceremony due to strict age requirements for marriage in China. When Zheng and Wen reached the legal age, the local officials refused to issue them a marriage certificate because they had not paid their fines, which penalized Zheng and Wen for getting married early and for having unauthorized children. Because their marriage now is not legally recognized due to "China's coercive family planning policies," it would "contravene the fundamental purpose of the [asylum] statute" to deny asylum to Zheng. *Id.* at 561. Zheng is therefore eligible for asylum because of the forced abortion of his child even though China does not recognize his marriage to Wen. Accordingly, "remand for further proceedings to determine whether [Zheng] has met the criteria for eligibility is simply unnecessary." *He*, 328 F.3d at 604.

Thus, on remand the BIA should exercise its discretion whether to grant asylum to Zheng.

**[12]** As to Zheng's eligibility for withholding of removal, in past cases involving coercive family planning policies, we have remanded to the BIA to evaluate the future threat of persecution and whether to grant withholding on that basis. *See Ge*, 367 F.3d at 1127 (remanding to the "BIA to determine, in the first instance, whether there is a clear probability that Ge would be persecuted if returned to China" where the officials had demanded that Ge's parents produce him or his wife for sterilization).

In reversing the IJ's adverse credibility claim here, we have concluded that petitioner's wife was forced to have an abortion and therefore suffered past persecution based on China's coercive family planning policies. *See* 8 U.S.C. § 1101(a)(42) (treating forced abortions as past persecution). In turn, past persecution based on a forced abortion gives rise to a regulatory rebuttable presumption that "the applicant's life or freedom would be threatened in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 208.16 (b)(1)(i). *See Navas v. INS*, 217 F.3d 646, 657 (9th Cir. 2000) (holding that once a petitioner has demonstrated past persecution, this supports "a presumption that the applicant has shown a clear probability of future persecution so as to entitle him to withholding of deportation").

**[13]** As the parties did not brief the issue of withholding to us on appeal in any detail, we remand to the BIA to decide whether Zheng is entitled to withholding in light of his presumed future persecution. *See In re C-Y-Z-*, 21 I. & N. Dec. 915, 919 (BIA 1997) (granting withholding in a sterilization case "because of the regulatory presumption of a well-founded fear of future persecution that arises from a finding of past persecution and the absence of changed country conditions"); *In re Y-T-L-,* 23 I. & N. Dec. 601, 606 (BIA 2003) (granting withholding in sterilization case after finding that a

sterilization and the passage of time did not rebut the presumption of future persecution because "[i]t is manifestly clear that Congress intended to make eligible for asylum those who were victims of China's coercive family planning policies, not simply those who could be victims if returned to China").

**[14]** Accordingly, we remand to the BIA to exercise its discretion whether to grant Zheng asylum and to determine whether Zheng is eligible for withholding of removal. *See He*, 328 F.3d at 604; *cf. Ali v. Ashcroft*, No. 03-71731, slip op. at 818 (9th Cir. Jan. 19, 2005).[7]

Petition **GRANTED** and **REMANDED**.

Petitions for rehearing on this amended opinion will be considered.

---

[7]Because Zheng has not sought review of the IJ's order denying relief under the Convention Against Torture, we need not decide whether remand to the BIA would be necessary for a determination of eligibility for relief under the Convention Against Torture.