**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

YAOGANG REN,

*Petitioner,*

v.

ERIC H. HOLDER Jr., Attorney
General,

*Respondent.*

No. 08-71315

Agency No.
A098-469-035

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Argued August 1, 2009
Submitted June 30, 2011
San Francisco, California

Filed August 19, 2011

Before: Procter Hug, Jr., Stephen Reinhardt and
Barry G. Silverman, Circuit Judges.

Opinion by Judge Reinhardt

11159

**COUNSEL**

Evangeline G. Abriel, Director, Legal Analysis, Research, and Writing, Santa Clara University School of Law, Santa Clara, Califoria; Kirt L. Iverson, Student Counsel, Santa Clara University School of Law, Santa Clara, Califoria, for the petitioner.

Lance Lomond Jolley, U.S. Department of Justice, Civil Division/Office of Immigration Litigation, Washington, DC; David V. Bernal, U.S. Department of Justice, Civil Division/Office of Immigration Litigation, Washington, DC, for the respondent.

## OPINION

REINHARDT, Circuit Judge:

### I.

Yaogang Ren petitions for review of the denial of his application for asylum, withholding of removal, and protection under the United Nations Convention Against Torture. Because he filed his application after May 11, 2005, his case is governed by the credibility and corroboration standards set forth in the REAL ID Act. Applying those standards, we hold that the Immigration Judge's ("IJ") adverse credibility determination was impermissibly based on mischaracterizations of Ren's testimony as well as inconsistencies that, considering the totality of the circumstances, were trivial. We further hold, however, that Ren was given the proper notice and opportunity to respond to the IJ's request for corroborative evidence. Because Ren failed to provide that evidence and did not provide any explanation for his failure to do so, and because the IJ was not compelled to conclude that Ren met his burden of proof without that evidence, we deny his petition.

### II.   Facts

Yaogang Ren, a native and citizen of China, entered the United States on a nonimmigrant B-1 visa on February 27, 2005. On June 7, 2005, he filed an application for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). In the statement submitted with his

asylum application, and in his testimony before the IJ, he gave the following account of the events that led him to the United States and the subsequent relevant occurrences.

In 2003, at a low-point in Ren's life, when the spread of SARS had forced him to close his restaurant and he found himself out of work and depressed, a friend introduced him to Christianity. At his friend's urging, Ren began to participate in underground church meetings, which were held in different private homes, including Ren's, on a rotating basis. At those meetings, Ren "spread Gospel." Soon, several members of the church helped him buy a truck, which allowed him to start a business transporting goods, and life started "getting better."

In 2004, Ren's church activities came to the attention of the local police. Two police officers came to his home, placed him under arrest, and accused him of "spreading [an] evil cult and host[ing] superstitious gatherings at home to poison the innocent people."

The police detained Ren for five days. On the first day, two officers interrogated him for one to two hours. Ren told the officers that "the end of the world is coming and that God is going to come down to the earth." The officers told Ren that he was "blinded by the religion." During the interrogation, one of the officers picked up an ashtray and threw it at him. As Ren choked from breathing in the ashes, the officers started punching him and beating him with a baton. Ren was beaten "so badly [he] was on the floor. [He] wouldn't dare come up." Later, the officers demanded that he write a confession. When he refused, the officers deprived him of food and water. At another point, the officers told him that his "brain [wa]s damaged" and he needed to be "disinfect[ed]" by "communist sunshine." They forced him to stand in the hot sun while wearing a raincoat. He sweated profusely and eventually fainted.

Ren was released on the fifth day of his detention, after his wife paid bail and he gave the police a letter in which he

promised to "break away with Christianity and stop spreading Gospels." The police then placed him under residential surveillance, and required him to check in with them every Monday. During these check-ins, police taunted him with comments like, "Why don't you help me to call Jesus here? You kneel down and bow to me twice. I can help you then." The police also confiscated the truck that he had been using for his delivery business, asserting that it did not pass the annual inspection test and was, therefore, illegal.

Unable to work or practice his religion, Ren decided that he could no longer remain in China. He secured a visa through a friend who solicited a "snakehead,"[1] and set out for the U.S., leaving his wife and daughter behind.

Since arriving in the U.S., Ren has been in touch with his wife by phone. She informed him that the police had been to their house looking for him and that she had denied knowing where he was. The police were "very mad at [his] running away," and had ordered him to come back immediately to "accept the judgment of the Party" for exposing his true face to "oppose the Party and the Government." Ren "dare[s] not go back to China" for fear that he will be persecuted due to his involvement with Christianity.

Within one month of arriving in the United States, Ren became a member of the United Christian Church in Hacienda Heights, California. He attends church often, although he sometimes has to miss services in order to perform odd jobs that he takes on to support himself.

### III.   Proceedings Below

After he applied for asylum, Ren was interviewed by an

---

[1]Snakeheads are smugglers who transport Chinese immigrants from China to the United States for a fee. *See Zheng v. Ashcroft*, 332 F.3d 1186, 1189 (9th Cir. 2003).

asylum officer; that officer referred him to removal proceedings. On July 19, 2005, Ren was served with a Notice to Appear and charged with removability pursuant to 8 U.S.C. 1227 § (a)(1)(B) for overstaying his non-immigrant visa.

Ren first appeared before an IJ on September 1, 2005. He conceded removability, but continued to seek asylum, withholding of removal, and CAT protection. On May 16, 2006, the IJ held a merits hearing, during which Ren testified. The IJ was not "prepared to issue a decision" on that day, so she recessed the hearing until May 26, 2006. On that date, the IJ informed Ren that he had not yet met his burden of proof, and that it was "really important for him to have corroborating evidence in this case." She then granted a continuance to allow Ren to gather specific corroborating evidence. On October 31, 2006, when the hearing resumed and Ren failed to provide the requested evidence, the IJ determined that he had failed to meet his burden of proof to show past persecution or a well-founded fear of future prosecution, and denied his application for asylum, as well as all other relief. The IJ based her decision on two alternative grounds. First, she made an adverse credibility determination based on "inconsistencies between [Ren's] testimony and his Declaration, as well as the inherent implausibility of his claim in comparison to his actions." Second, she concluded that, even assuming Ren's testimony had been credible, he "ha[d] failed to meet his burden of proof as he has failed to provide the readily available corroborating evidence in support of his claim."

Ren timely appealed the IJ's decision to the BIA, which affirmed the IJ without opinion. Ren then filed a timely petition for review with this court.

## IV.   Jurisdiction and Standard of Review

This court has jurisdiction under 8 U.S.C. § 1252 to review final orders of removal by the BIA. Where, as here, the BIA summarily adopts the IJ's decision without opinion pursuant

to 8 C.F.R. § 1003.1(e)(4), we "review the IJ's decision as if it were the BIA's decision." *Zheng v. Ashcroft*, 397 F.3d 1139, 1143 (9th Cir. 2005). The IJ's findings of fact are reviewed under a "substantial evidence standard," *Khan v. Holder*, 584 F.3d 773, 776 (9th Cir. 2009), and "are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). The IJ's determination that Ren failed to meet his burden of proof is also conclusive subject to application of that same standard. *INS v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992).

The government argues that we lack jurisdiction to review the IJ's "dispositive corroboration finding" — and, consequently, the entire petition — because Ren failed to exhaust his administrative remedies by challenging that finding before the BIA. We disagree.

"Because [Ren] raised his claims [before the BIA] pro se, we construe them liberally." *Agyeman v. INS*, 296 F.3d 871, 878 (9th Cir. 2002) (citing *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)). "We do not employ the exhaustion doctrine in a formalistic manner," *Figueroa v. Mukasey,* 543 F.3d 487, 492 (9th Cir. 2008), especially where the petitioner is *pro se*, *Agyeman*, 296 F.3d at 878; general contentions can suffice as long as they "put the BIA on notice" of the contested issues. *Moreno-Morante v. Gonzales*, 490 F.3d 1172, 1173 n.1 (9th Cir. 2007). In fact, "[p]etitioners need not 'argue' anything so long as the issue is presented to the BIA." *Figueroa*, 543 F.3d at 493.

Ren did not file a brief before the BIA. In his notice of appeal, in addition to challenging the credibility finding, Ren stated, "I believe that I did establish that my life/freedom would have been threatened in China on account of my strong beliefs and practice of Christianity." Although he did not use the specific word "corroboration," it was clear that he was challenging the IJ's determination that he had failed to meet his burden of proof or, in other words, that he had failed to

"establish" that he had suffered past persecution or had a well-founded fear of future persecution.

The IJ had explicitly described her corroboration finding as a finding that Ren had "failed to meet his burden of proof." By stating that he believed that he had met his burden of proof, Ren raised a specific challenge to the IJ's corroboration determination. Ren did not merely assert that the IJ's decision was wrong without identifying the basis for his challenge. A *pro se* petitioner is not required to use the precise legal terminology "I met my burden of proof"; Ren's statement that he established his claim is more than sufficient to make clear the basis of his challenge. *See Vizcarra-Ayala v. Mukasey,* 514 F.3d 870, 874 (9th Cir. 2008) (petitioner's argument was properly exhausted even though it challenged the wrong ground for removal because BIA had sufficient notice that he "intended to challenge the ground on which he was ordered removed.") We therefore conclude that Ren's *pro se* notice of appeal, while possibly "inartful[ ]," provided the BIA with "adequate opportunity to correct any errors occurring in the proceedings below." *Agyeman,* 296 F.3d at 877-78. Accordingly, the exhaustion requirement is satisfied and we have jurisdiction to review Ren's petition.

## V.    Adverse credibility

### A.

**[1]** As this court recently explained at length, the REAL ID Act established new standards for adverse credibility determinations in proceedings on applications for asylum, withholding of removal, and CAT relief that, like Ren's, were submitted on or after May 11, 2005. *See Shrestha v. Holder*, 590 F.3d 1034 (9th Cir. 2010). The primary change was that the REAL ID Act abrogated this circuit's rule that inconsistencies that do not go to the heart of an applicant's claim may not support an adverse credibility determination. *See* 8 U.S.C. § 1158(b)(1)(B)(iii) ("[A] trier of fact may base a credibility

determination on . . . any inaccuracies or falsehoods in [the applicant's] statements, without regard to whether [they] go[ ] to the heart of the applicant's claim."). Under the REAL ID Act, the IJ may base an adverse credibility determination on any relevant factor that, considered in light of the totality of the circumstances, can reasonably be said to have a "bearing on a petitioner's veracity." *Shrestha*, 590 F.3d at 1044. Conversely, "[t]rivial inconsistencies that under the total circumstances have no bearing on a petitioner's veracity should not form the basis of an adverse credibility determination." *Id.*

Although the REAL ID Act expands the bases on which an IJ may rest an adverse credibility determination, it "does not give a blank check to the IJ enabling him or her to insulate an adverse credibility determination from our review of the reasonableness of that determination." *Id.* at 1042.[2] We must not forget that the stakes in asylum proceedings are high and that serious errors in decisions issued by overworked immigration judges and BIA officials are not unusual. *Cf. Kadia v. Gonzales*, 501 F.3d 817, 821 (7th Cir. 2007) (observing that "[r]epeated egregious failures of the Immigration Court and the Board to exercise care commensurate with the stakes in an asylum case can be understood, but not excused, as consequences of a crushing workload . . . .").

**[2]** The REAL ID Act did not alter our "substantial evi-

---

[2]As we noted in *Shrestha*, "concerning credibility, the REAL ID Act's principal purpose was to eliminate [our prior] limitation . . . on the type of inconsistencies upon which an IJ could rely in assessing credibility." *Shrestha*, 590 F.3d at 1042 n.3 (internal quotation marks omitted). That is, "[t]he REAL ID Act implemented an important substantive change concerning the kinds of inconsistencies that may give rise to an adverse credibility determination," but it "did not strip us of our ability to rely on the institutional tools that we have developed" for reviewing an IJ's credibility determinations. *Id.* at 1042-1043. So we have continued to rely on other aspects of our pre-REAL ID Act caselaw concerning credibility when reviewing post-REAL ID Act asylum applications. *See, e.g.*, *id.* at 1044 (citing *Soto-Olarte* v. *Holder*, 555 F.3d 1089, 1091 (9th Cir. 2009)).

dence" standard of review for adverse credibility determinations. *Shrestha*, 590 F.3d at 1042. In order to continue to make this review possible, IJs remain obligated to provide "specific and cogent reasons supporting an adverse credibility determination." *Id.*

[3] As explained above, those reasons must consist of something more than "[t]rivial inconsistencies that under the total circumstances have no bearing on a petitioner's veracity." *Id.* at 1044. In reviewing the IJ's adverse credibility determination, this court "must . . . take into account the totality of the circumstances, and should recognize that the normal limits of human understanding and memory may make some inconsistencies or lack of recall present in any witness's case." *Id.* at 1044-45. As Judge Posner wrote for the *Kadia* Court, "[a]nyone who has ever tried a case or presided as a judge at a trial knows that witnesses are prone to fudge, to fumble, to misspeak, to misstate, to exaggerate. If any such pratfall warranted disbelieving a witness's entire testimony, few trials would get all the way to judgment." 501 F.3d at 821. Finally, we note that the consistency of the applicant's statements with the reports of the Department of State on country conditions is among the relevant factors that the IJ must consider in his review of the totality of the circumstances. 8 U.S.C. § 1158(b)(1)(B)(iii).

## B.

[4] With these rules in mind, we turn to the adverse credibility determination before us. The IJ cited five supposed inconsistencies or implausibilities as the basis for her determination that Ren was not credible.[3] We discuss each in turn. *See Kaur v. Ashcroft*, 379 F.3d 876, 885 (9th Cir. 2004).

---

[3]We are in a better position to review an adverse credibility finding where, as here, the finding is based on documentary evidence rather than any finding regarding the applicant's demeanor. *See Kin v. Holder,* 595 F.3d 1050, 1056 (9th Cir. 2010); *see also Kadia*, 501 F.3d at 820; *Tun v. INS,* 445 F.3d 554, 563 (2d Cir. 2006).

**[5]** First, the IJ found it "significant" that, in Ren's written statement, he had declared that he was placed in a raincoat and told to stand outside in the heat until he fell unconscious on the *third* day of his detention, whereas in court he testified that the incident took place on the *second* day. This inconsistency is manifestly trivial. We have previously recognized that victims of abuse "often confuse the details of particular incidents, including the time or dates of particular assaults and which specific actions occurred on which specific occasion." *Singh v. Gonzales*, 403 F.3d 1081, 1091 (9th Cir. 2005) (citing Deborah Davis & William C. Follette, *Foibles of Witness Memory for Traumatic/High Profile Events*, 66 J. Air L. & Com. 1421, 1514-15 (2001)). Thus, "the ability to recall precise dates of events years after they happen is an extremely poor test of how truthful a witness's substantive account is." *Id*. Although the REAL ID Act now gives immigration judges the power to consider any inconsistency in evaluating an applicant's credibility, the power to consider any inconsistency "is quite distinct from the issue of whether the inconsistencies cited support an adverse credibility determination." *Shrestha,* 590 F.3d at 1043 (quoting Scott Rempell, *Credibility Assessments and the REAL ID Act's Amendments to Immigration Law*, 44 Tex. Int'l L.J. 185, 206 (2008)). As explained above, to support an adverse credibility determination, an inconsistency must not be trivial and must have some bearing on the petitioner's veracity. *Id.* at 1044. As we have repeatedly held, "minor discrepancies in dates that . . . cannot be viewed as attempts by the applicant to enhance his claims of persecution have no bearing on credibility." *Singh*, 403 F.3d at 1092 (quoting *Damaize-Job v. INS*, 787 F.2d 1332, 1337 (9th Cir. 1986)). Considered under the totality of the circumstances, Ren's uncertainty regarding whether he was made to pass out on the second or the third day of his detention says nothing about his truthfulness or the overall reliability of his account, nor was it an attempt to enhance his claims. Accordingly, it may not form a basis for an adverse credibility determination.

**[6]** Second, the IJ found that Ren's inability at the merits hearing "to provide even the month or the year [of his arrest] seriously undermines his credibility." We disagree, particularly because the IJ's characterization of Ren's testimony is inaccurate. In his declaration, Ren stated that he was arrested on July 13, 2004. When questioned during his hearing, he could not provide the exact date of the arrest but stated that "four, five, [or] six months" had passed between his arrest and the date he left China for the United States. Ren left China on February 27, 2005. His testimony therefore narrowed the time frame of his arrest to a roughly accurate three-month period.[4] Accordingly, the IJ's conclusion that Ren had not provided "the month or the *year*" of his arrest was mistaken. As we explained above, given the recognized difficulty that people in general, and victims of abuse in particular, have with recalling dates, an asylum applicant's failure to be specific about the date of a traumatic experience is rarely probative of his or her veracity. *See Singh,* 403 F.3d at 1090-92. In this case, considering the totality of the circumstances, including the fact that Ren's testimony regarding his arrest date was roughly consistent with his declaration and narrowed that date to within a three-month time frame, his inability to provide a higher degree of specificity is not meaningful.

**[7]** The third inconsistency the IJ noted also concerned a date, that of Ren's baptism in China. Ren initially testified that he was baptized on October 17, 2004. Shortly thereafter, the IJ asked him again about the date of his baptism, and Ren corrected himself, replying, "2003 or 2004, October 17, 2003." He then adhered to the 2003 date, which is consistent with the baptismal date in his declaration. When asked why he had initially given the year as 2004, Ren explained that he simply made a mistake the first time — that he "remember-

---

[4]Depending on whether the month of arrest and the month of departure are counted in determining how many months "passed" between the two events, Ren's testimony narrowed his arrest date to the three-month period from either July to September or August to October of 2004.

[ed] it wrong" and "said it wrong." The IJ found Ren's testimony on his baptismal date to be "questionable at best," and found it "unpersuasive" that Ren referred to this as a "monumental day in his life" and yet "made a mistake" about the date. In coming to this conclusion, the IJ once again mischaracterized Ren's testimony. The IJ stated,

> He initially testified that he was baptized on October 17, 2004. The Court then asked him if he is certain about that date considering that the Declaration stated it occurred in 2003. At which point the Respondent testified that he is not sure. It could be 2003 or 2004.

The IJ's account is disturbingly inaccurate. In reality, the IJ merely asked Ren again when he was baptized, without noting any inconsistency between his prior testimony and his declaration. At that point, Ren voluntarily corrected himself, and then repeated the 2003 date several times. The IJ's version of events, which includes her leading Ren to change his testimony to cure the alleged inconsistency with his declaration, simply has no basis in the record.

In reviewing an adverse credibility determination, "the mistakes that witnesses make in all innocence must be distinguished from slips that, whether or not they go to the core of the witness's testimony, show that the witness is a liar or his memory completely unreliable." *Kadia*, 501 F.3d at 822. Here, Ren's initial error regarding the year of his baptism was quite clearly a quickly-corrected innocent mistake. As such, it cannot form the basis for an adverse credibility determination.

**[8]** The IJ next found that Ren's testimony regarding the regularity of his church attendance "seriously undermines [his] credibility" by demonstrating "the inherent implausibility of his claim in comparison to his actions." *See* 8 U.S.C. § 1158 (b)(1)(B)(iii). Yet again, the IJ mischaracterizes Ren's

testimony. Ren stated that he attends church on a weekly basis, usually on Friday evenings and sometimes also on Sundays. He explained that sometimes he misses services because he has to perform odd jobs to support himself, and occasionally those jobs conflict with his time of church attendance. He testified that he attends services "every time when the friend at church has a car to come pick [him] up." He further explained that "[e]very time [the church] would send a car . . . including the Friday night. It's the same way, they come to fetch us."

The IJ interpreted Ren's statements to mean that church attendance was a "low priority" for him and inferred that Ren was not a committed Christian because he only went to church "if he ha[d] no other plans for his day" and was unwilling to "take public transportation to church or join[ ] a church that is within walking distant [sic] to [him]." It is clear from the record, however, that Ren said only that he sometimes has to miss services because of work conflicts, and that he takes advantage of the transportation services regularly provided by the church. That Ren must occasionally miss church services in order to sustain his livelihood, or that he gets a ride to church rather than taking the bus, in no way undermines the genuineness of his belief or the importance to him of living in a country where he can freely practice his religion.[5] The IJ's findings to the contrary are entirely speculative and do not constitute substantial evidence. *See Shah v. INS*, 220 F.3d 1062, 1069 (9th Cir. 2000).

[9] Finally, the IJ found Ren not credible because his "knowledge of Christianity was at best less than basic." The IJ found that Ren's recitation of the Lord's Prayer was

---

[5]Moreover, there are many reasons why he may have joined that church, rather than another church closer to his house, including that it "catered to Chinese individuals like Mr. Ren." The IJ's belief that a church within walking distance would have been better suited for Ren is pure speculation.

"clearly incorrect as [the prayer] had references to [Ren] and his desire to bring his family to the United States." The record on this issue contains a confusing exchange between Ren and the government attorney.[6] It is not clear whether Ren understood that he was being asked to recite the particular prayer known as the "Lord's Prayer" rather than to offer a prayer to the Lord.[7] In addition, the IJ could only speculate that the "Lord's Prayer" was called by the same name in China; no basis for that conclusion is found in the record.

In general, questioning an applicant on his knowledge of religious doctrine to determine if he is a true believer is not an appropriate method of determining eligibility for asylum. As the Second Circuit has recognized:

---

[6]The exchange was as follows:

Government Attorney: Do you know the Lord's Prayer?

Ren: Yes, I know.

Government Attorney: Can you say it for us?

Ren: *Prayer?* Yes, I can say it.

Government Attorney: Will you please recite it?

Ren: Father above thank you. Bring us a peaceful day every day. And thank you. Bless my whole family, my wife, my son, my child, my friends. They have a peaceful day and every day. And thank you for keeping me in America for my future path. Please help me above prayer, by the name of God. Amen.

(emphasis added)

[7]We note that translation difficulties may have led to this confusion. At one point Ren's attorney pointed out that the interpreter was saying the words "Lord's Prayer" in English, although the interpreter said that she was also translating the words after saying them in English. At another point, the attorney noted that Ren's answer to a question may have been "lost in the translation." The IJ took umbrage at this suggestion, and said she didn't "appreciate any sort of—implicit at least, attack on the interpreter that occurred." We have previously noted that "faulty or unreliable translations can undermine evidence on which an adverse credibility determination is based." *He v. Ashcroft*, 328 F.3d 593, 598 (9th Cir. 2003).

> [b]oth history and common sense make amply clear
> that people can identify with a certain religion, not-
> withstanding their lack of detailed knowledge about
> that religion's doctrinal tenets, and that those same
> people can be persecuted for their religious affilia-
> tion. Such individuals are just as eligible for asylum
> on religious persecution grounds as are those with
> more detailed doctrinal knowledge.

*Rizal v. Gonzales,* 442 F.3d 84, 90 (2d Cir. 2006); *see also Yan v. Gonzales*, 438 F.3d 1249, 1255 (10th Cir. 2006) ("[A] detailed knowledge of Christian doctrine may be irrelevant to the sincerity of an applicant's belief; a recent convert may well lack detailed knowledge of religious custom.") (citing *Ahmadshah v. Ashcroft*, 396 F.3d 917, 920 n.2 (8th Cir. 2005)).

Given that the record reveals no evidence of what the Lord's Prayer is called in China or whether someone of Ren's background would have learned that prayer, the fact that Ren did not accurately recite it says nothing about the "inherent plausibility" of his claim. While giving unwarranted significance to Ren's failure to recite the "Lord's Prayer," the IJ overlooked other testimony that *did* reflect Ren's knowledge of Christianity. Ren accurately answered that Adam and Eve were in the Garden of Eden and that Jesus died on the cross, and explained that "Christianity is belief in God, belief in the end of the world,[8] believes [sic] Jesus is the only Savior." In light of the totality of this testimony, and the problems with doctrinal questioning generally, we conclude that Ren's failure to recite the Lord's Prayer accurately is trivial and does not support an adverse credibility determination.

---

[8]*See, e.g.*, *Matthew* 24.

## C.

**[10]** Under the REAL ID Act, even minor inconsistencies that have a bearing on a petitioner's veracity may constitute the basis for an adverse credibility determination. *Shrestha*, 590 F.3d at 1044. In this case, however, the IJ's adverse credibility determination rested largely on mischaracterizations of Ren's testimony that are belied by the record.[9] To the extent that the inconsistencies and implausibilities cited by the IJ do exist, they are manifestly trivial and have no bearing on Ren's veracity.

**[11]** Aside from these trivial inconsistencies, Ren's testimony was overwhelmingly consistent with both his prior statements and with the country reports that he submitted as supporting evidence. The 2005 State Department Country Report on China, which Ren submitted into evidence at his hearing, confirms that the Chinese government had "continued its repression of groups that it determined to be 'cults' " and that "[a]uthorities frequently disrupted [Christian] house church meetings and retreats and detained leaders and church members." It further confirms that detained church members were at times subject to physical abuse and extended imprisonment. Consistency with the country reports provided by the Department of State is one of the enumerated factors to be

---

[9]The numerous inaccuracies in the IJ's decision may be a byproduct of the common practice among immigration judges of reading oral decisions from the bench. We do not comment on whether such a practice is advisable or whether, under present circumstances, any practical alternative exists. We do caution immigration judges, however, to take care to ensure that the facts that they are relying on are consistent with the record. We cannot on the one hand require an asylum applicant to be precise about every major or minor factual detail of his claim, and then on the other hand tolerate major factual inaccuracies in the decision that denies that claim. As we discussed above, immigration judges are overworked and understaffed, through no fault of their own. It is incumbent upon them, however, to exercise the utmost care in rendering their decisions, particularly given the gravity of their responsibility and the deference we must give their decisions on appeal.

considered by the IJ in evaluating the "totality of the circumstances" for a credibility determination. *See* 8 U.S.C. § 1158(b)(1)(B)(iii).

We conclude that, "[c]onsidering the totality of the circumstances, and all relevant factors," 8 U.S.C. § 1158(b)(1)(B)(iii), the inconsistencies cited by the IJ are, both on their own and in the aggregate, manifestly trivial. Because the IJ's adverse credibility determination thus rests on impermissible grounds, we reverse that determination and deem Ren's testimony credible. *See Kaur*, 379 F.3d at 890.

## VI.    Corroboration

Having concluded that the IJ's adverse credibility determination was not supported by substantial evidence, we now consider whether Ren's application was nonetheless properly denied on the alternative ground that he failed to provide sufficient corroborating evidence when requested to do so, and therefore failed to meet his burden of proof.

### A.

**[12]** In addition to changing the standards for adverse credibility determinations in asylum proceedings, the REAL ID Act altered this court's rules regarding when an asylum applicant may be required to provide corroboration to meet his burden of proof. Prior to the REAL ID Act, we had long held "that the BIA may not require independent corroborative evidence from an asylum applicant who testifies credibly in support of his application." *Kataria* v. *INS*, 232 F.3d 1107, 1113 (9th Cir. 2000); *Ladha* v. *INS*, 215 F.3d 889, 901 (9th Cir. 2000) (collecting cases). But, as we recently recognized, "Congress abrogated these holdings in the REAL ID Act of 2005." *Aden* v. *Holder*, 589 F.3d 1040, 1044 (9th Cir. 2009). In *Aden*, we found that "[t]he statutory phrase '[The testimony of an applicant] may be sufficient to sustain the applicant's

burden without corroboration' implies that the testimony may not be sufficient." *Id.* (quoting 8 U.S.C. § 1158(b)(1)(B)(ii)).

In this case, after hearing the evidence presented, principally Ren's testimony, the IJ first adjourned the hearing for ten days and then granted a five-month continuance to enable Ren to obtain corroborating evidence of his arrest in China and his religious activity in the United States. In granting the continuance, the IJ stated that Ren had not yet met his burden of proof, and advised Ren that under the REAL ID Act, he was required to provide further corroboration in order to do so. The IJ made clear the evidence that would serve to corroborate his past persecution in China: a bail receipt that Ren had testified was available and would show that he had in fact been arrested. The IJ also made clear the evidence that would corroborate his current practice of Christianity: testimony from his pastor and a certificate documenting his baptism in the United States. At the third hearing, Ren failed to submit any of these three items of evidence. The IJ did not ask Ren why he had failed to submit any of them, and Ren did not offer any explanation. The IJ concluded, however, that Ren had failed to meet his burden of proof because he had failed to provide the requisite corroborating evidence or explain why he had failed to do so.[10]

## B.

[13] We must first decide whether under the REAL ID Act, the IJ, having concluded that corroborative evidence was necessary, was required to give Ren notice of that decision and provide him with an opportunity to obtain the required evidence or explain his failure to do so. A plain reading of the statute's text makes clear that an IJ must provide an applicant with notice and an opportunity to either produce the evidence

---

[10]The IJ also found that Ren's submission of two letters from church leaders, along with the remainder of the record, was not sufficient to meet his burden of proof.

or explain why it is unavailable before ruling that the applicant has failed in his obligation to provide corroborative evidence and therefore failed to meet his burden of proof.

The relevant subsection of Act provides in full:

> The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

8 U.S.C. § 1158(b)(1)(B)(ii).

The Act requires that the IJ first "determin[e] whether the applicant has met the applicant's burden, . . . weigh[ing] the credible testimony along with the other evidence of record." 8 U.S.C. § 1158(b)(1)(B)(ii). The statute then goes on to address a subset of such determinations: those that find an applicant's testimony credible, but nonetheless insufficient to meet his burden.[11] In such cases, the statute continues, "[w]here the trier of fact [i.e., the IJ] *determines* that the applicant *should provide* evidence that corroborates otherwise credible testimony, such evidence *must be provided* unless the applicant *does not have* the evidence and *cannot reasonably obtain* the evidence." *Id.* (emphases added).

---

[11]That is the case here, because even though the IJ found Ren not credible, the IJ's ruling requiring corroboration was a part of an alternative holding that assumed that Ren's testimony was credible.

**[14]** We will evaluate each part of the relevant statutory sentence in turn. First, it is only when the IJ determines that such corroborative evidence is necessary that the applicant must then provide it. "Where" . . . in this context is equivalent to "if" or "when," *see* Bryan A. Garner, *A Dictionary of Modern Legal Usage* 928 (2d ed. 1995); accord *Black's Law Dictionary* 1596 (6th ed. 1990) ("If; in the case of; in the event that."). Once the IJ has decided that he is not persuaded by the applicant's otherwise credible testimony, he may "determine[ ] that the applicant *should provide* evidence that corroborates" that testimony. 8 U.S.C. § 1158(b)(1)(B)(ii) (emphasis added.) "Congress's use of a verb tense is significant in construing statutes." *United States v. Wilson*, 503 U.S. 329, 333 (1992). Here, the Act does not say "should *have* provided," but rather "should provide," which expresses an imperative that the applicant must provide further corroboration in response to the IJ's determination. The applicant cannot act on the IJ's determination that he "should provide" corroboration, of course, if he is not given notice of that determination until it is too late to do so.

**[15]** Second, the grammatical structure of the controlling clause makes the provision's meaning absolutely clear. The statute requires that corroborating evidence "must be provided" in the event that the IJ determines that it should be provided. Again, this language focuses on conduct that *follows* the IJ's determination, not *precedes* it, as the phrase "must *have been* provided" would do, and as with the clause above, the statute's future directed language means that the applicant must be informed of the corroboration that is required. Third, the statute goes on to excuse an applicant from satisfying the IJ's request for corroboration if he "*does not have* the evidence and *cannot reasonably obtain* it." This language is present- and future-oriented as well; the statute does not say "unless the applicant *did* not have the evidence and *could not have* reasonably *obtained* the evidence." Therefore, if the IJ decides that the applicant *should* provide corroboration, the applicant must then have an opportunity to provide it, or to

explain that he does not have it and "cannot reasonably obtain it." It would make no sense to ask whether the applicant can obtain the information unless he is to be given a chance to do so.

Accordingly, the statute is clear. An applicant must be given notice of the corroboration required, and an opportunity to either provide that corroboration or explain why he cannot do so.[12] Because "the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc.* v. *Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984).[13]

---

[12]This does not necessarily require two hearings. If the applicant states at the first hearing that he does not have the evidence and cannot reasonably obtain it, the IJ should grant him an opportunity at that point to state why he cannot reasonably obtain it. In such a case, a continuance to obtain the evidence would be unnecessary; the IJ must then evaluate the applicant's explanation and determine on the record whether the evidence is reasonably obtainable or whether other evidence might suffice. *See El-Sheikh v. Ashcroft*, 388 F.3d 643, 647 (8th Cir. 2004) (citing *Diallo v. INS*, 232 F.3d 279, 287 (2d Cir. 2000)).

[13]The Seventh Circuit recently held that no notice or opportunity to provide corroborative evidence was required, principally for policy reasons: primarily that reading the statute to provide for notice and an opportunity to respond would "necessitate two hearings" and that the DHS is already overburdened. *Abraham v. Mukasey*, ___ F.3d ___, No. 10-2256, 2011 WL 2138149 at *6 (7th Cir. June 1, 2011) (quoting *Raphael v. Mukasey*, 533 F.3d 521, 530 (7th Cir. 2008)). The Seventh Circuit failed to note, however, that notice and opportunity to respond applies only in the case of an applicant deemed credible by the IJ, and that even in those cases, a second hearing would often not be required. *See supra* note 12. More important, the Seventh Circuit did not undertake any analysis of the statute's text in order to ascertain its plain meaning. We think it clear that our analysis of the statutory language leaves no doubt that Congress intended that in the case of a credible applicant, when the IJ believes that corroborating evidence is required, he must so advise the applicant and give him an opportunity to provide such evidence. The Seventh Circuit's argument that any required notice is provided by the statute is wholly inconsistent with the text of the statute, as demonstrated above.

**[16]** Moreover, even if the language had been ambiguous, the canon of constitutional avoidance requires us to come to the result discussed above. The canon "requires a statute to be construed so as to avoid serious doubts as to the constitutionality of an alternate construction." *Nadarajah v. Gonzales*, 443 F.3d 1069, 1076 (9th Cir. 2006). The REAL ID Act did not change our clear Fifth Amendment caselaw that requires a "full and fair hearing" in deportation proceedings. *Campos-Sanchez v. INS*, 164 F.3d 448, 450 (9th Cir. 1999). We have previously observed that "demand[ing] [corroboration] immediately on the day of the hearing" would "raise[ ] serious due process concerns by depriving [an applicant] of his guarantee of a reasonable opportunity to present evidence on his behalf." *Marcos v. Gonzales*, 410 F.3d 1112, 1118 n.6 (9th Cir. 2005) (internal quotation marks omitted).[14] A requirement that something be provided even *before* notice is given would raise even more due process concerns. This provides additional support for our interpretation of the statute, although we reiterate that the statutory text alone mandates our interpretation.

---

[14]Moreover, any contrary ruling would make our procedural requirements for corroboration drastically different from our procedural requirements for credibility determinations. In *Campos-Sanchez v. INS*, 164 F.3d 448 (9th Cir. 1999), we held that the BIA violated the Fifth Amendment's guarantee of due process when it made an adverse credibility determination on the basis of discrepancies in the applicant's story, but "had not . . . advised [the applicant] that his credibility was questionable, or that any discrepancies appeared to exist," nor asked him "to explain any such perceived discrepancies." *Id.* at 450. Because he "had no notice of the inconsistencies perceived by the BIA, and no opportunity to explain them," the BIA had denied him the "full and fair hearing" to which he was entitled. *Id.* at 450-451. We have reaffirmed this principle many times since. *See, e.g.*, *Soto-Olarte*, 555 F.3d at 1092 ("[T]he IJ could not properly base her adverse credibility determination on the inconsistencies between Soto-Olarte's testimony and the police report that Soto-Olarte did not explain in his declaration, when she did not ask Soto-Olarte about these discrepancies or give him an opportunity to reconcile them."); *Chen v. Ashcroft*, 362 F.3d 611, 618 (9th Cir. 2004); *Ordonez v. INS*, 345 F.3d 777, 786 (9th Cir. 2003). Nothing in the REAL ID Act altered this rule. *See supra* note 2.

Therefore, the IJ must undertake the following sequential analysis. To begin, the IJ must determine whether an applicant's credible testimony alone meets the applicant's burden of proof. If it does, no corroborative evidence is necessary. If a credible applicant has not yet met his burden of proof, then the IJ may require corroborative evidence. If corroboration is needed, however, the IJ must give the applicant notice of the corroboration that is required and an opportunity either to produce the requisite corroborative evidence or to explain why that evidence is not reasonably available.

## C.

**[17]** Having determined that the statute requires notice and an opportunity to respond, we next ask whether Ren was afforded that notice and opportunity. We hold that Ren was given notice of the parts of his testimony that required corroboration and the evidence the IJ found necessary to corroborate that testimony. He was also afforded a sufficient opportunity to obtain the evidence or explain his failure to do so.

A brief recitation of the facts in this case is necessary in order to explain that conclusion. At the initial merits hearing, Ren was asked specifically about the bail receipt on cross examination and he said that his wife had it in her possession and that he had not asked her for it because he had not known that he needed it. The IJ also asked Ren about the U.S. baptismal certificate and Ren said that he had it at home, but had not brought it with him to the hearing. At the close of the first merits hearing, the IJ deferred her decision for ten days. At the second hearing, the IJ made clear to Ren not only the testimony for which corroboration was necessary, but also the specific items of corroborative evidence that Ren should provide. The IJ granted the continuance so that Ren could get "documents" to corroborate his church membership in the United States and his arrest in China. The record is clear that the specific documents to which she referred were the bail receipt and the baptismal certificate from his local church.

Finally, the IJ told Ren that it would be necessary for his pastor to come and testify about Ren's involvement in the church. The IJ informed Ren that she had many unanswered questions that she would like the pastor to answer. When Ren's attorney asked whether a letter or affidavit would suffice, the IJ replied that they would not and reiterated that it was necessary that the pastor testify in person.

Then, the IJ said that she was "putting [Ren] on notice that . . . under the REAL ID Act" a lack of corroboration could "legitimately be considered as the basis for the Court's Decision in determining burden of proof." She then continued the hearing for approximately five months. At the third hearing, Ren presented two letters from officers of the church but not the requested documents, and no live witnesses. The IJ then asked Ren if he had "anything further." Ren's counsel replied in the negative and offered no explanation for Ren's failure to provide the corroborative evidence specified by the IJ. We hold that Ren had adequate notice of the need for corroborating evidence that would meet his burden of proof, as well as sufficient time to obtain that evidence or explain why he could not do so. *See Sandie v. Att'y Gen.*, 562 F.3d 246, 254 (3d Cir. 2009) (finding that a time lapse between hearings was one reason why it was clear that the applicant had an opportunity to respond).

**[18]** Ren argues that he was not given an opportunity to respond because the IJ did not specifically ask him at the third hearing why he failed to present the corroborating evidence. We disagree. Although it would be desirable for an IJ to ask whether there is a reason that an applicant fails to provide the corroborative evidence that he has been asked to produce, the continuance and the hearing itself provides an applicant represented by counsel with the statutorily required opportunity.

We do not decide whether there are circumstances in which an IJ would have an affirmative duty to request an applicant's

explanation for his failure to provide corroborating evidence;[15] we hold only that under the circumstances described above, the IJ did not have such a duty.[16]

## D.

**[19]** Finally, we must decide whether the evidence that Ren *did* provide compelled the conclusion that he met his burden of proof. *See Aden*, 589 F.3d at 1040. Ren's corroborative evidence consisted of two short and vague letters from officers of his church in the United States that did not mention China and did not answer the questions that the IJ had posed about Ren's church involvement in the United States. We hold that those letters along with the rest of the evidence in the record do not compel the conclusion that Ren met his burden of proof.

## VII.   Conclusion

We hold that the IJ's adverse credibility determination is not supported by substantial evidence, and therefore deem

---

[15]For instance, although Ren was represented by counsel at his hearing, our caselaw suggests that such a duty might exist if the applicant were *pro se*. *See, e.g. Pangilinan v. Holder*, 568 F.3d 708, 709 (9th Cir. 2009) ("Because aliens appearing *pro se* often lack the legal knowledge to navigate their way successfully through the morass of immigration law, and because their failure to do so successfully might result in their expulsion from this country, it is critical that the IJ 'scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.' " (quoting *Agyeman v. INS*, 296 F.3d 871, 877 (9th Cir. 2002)).

[16]We note also that substantial evidence supports the IJ's conclusion that the evidence requested was reasonably obtainable. Ren testified that he had the baptism certificate at his house, and his counsel acquiesced when the IJ requested that his pastor come to testify. Moreover, Ren testified that the bail receipt was in his wife's possession in China and that the only reason he had not obtained it for the initial hearing was that he did not know that he needed it. Ren also testified that he had been in contact with his wife in China and that she had sent him other documents through the mail.

Ren's testimony credible. We also hold, however, that Ren received adequate notice and an opportunity to respond to the IJ's request for corroborative evidence, that he failed to provide such evidence or any explanation as to why it was unavailable, and that the IJ was not compelled to conclude that Ren met his burden of proof without the corroborating evidence that she requested. Therefore, the petition is **DENIED**.[17]

---

[17]Because Ren failed to meet his burden of proof for asylum, he necessarily failed to meet the higher burden of proof for withholding of removal. Ren's CAT claim also fails because he has not established that it is more likely than not that he will be tortured if removed to China.